**In the Interest of K.A.S., J.G.S., and W.S., II.**

**No. 2–02–402–CV.**

Court of Appeals of Texas, Fort Worth.

Feb. 5, 2004.

Rehearing Overruled March 11, 2004.

218

Elizabeth Solomon Addison, David M. Wacker, Denton, for Appellants.

Bruce Isaacks, Criminal District Atty., Kathleen Walsh, William Kuykendall, Tracy Ho, Catherine Luft, and Duke Hooten, Assistant District Attys., Denton, for Appellees.

John Lawhon, Denton, for Ad Litem.

Panel A: CAYCE, C.J.; ANNE GARDNER, J. and SAM J. DAY, J. (Retired, Sitting by Assignment).

## OPINION

ANNE GARDNER, Justice.

### I. Introduction

W.S. ("Father") and D.S. ("Mother") appeal from the trial court's order terminating their parental rights to their three children. Both Father and Mother complain that the evidence is legally and factually insufficient to support any of the three

statutory grounds for termination pleaded by the Texas Department of Protective and Regulatory Services ("TDPRS") and found by the trial court and that the evidence was legally and factually insufficient to support the trial court's findings that termination was in the best interest of the children. *See* Tex. Fam.Code Ann. § 161.001(1)(D), (E), (O); (2) (Vernon 2002). Father and Mother also raise constitutional challenges to the family code's one-year deadline to render a final order in a termination case. *See id.* § 263.401. We will affirm.

## II. Factual and Procedural Background

Father and Mother married in 1992; since that time their relationship has been plagued by domestic violence and abuse. They are the biological parents of K.A.S., born December 15, 1993; J.G.S., born February 24, 1995; and W.S., II, born October 10, 1998.

On October 18, 2001, K.A.S. told Mother that she had tried to kill herself by choking herself in the bathroom. On October 24, Mother took K.A.S. to see Amy Teel, a Friends of the Family counselor. After speaking with K.A.S. about the suicide attempt, in which K.A.S. claimed that the reason for her suicide attempt was the domestic violence in her home, Ms. Teel arranged for K.A.S. to be admitted to Cooks Children's Hospital. K.A.S. was released from the hospital on October 31.

On October 31, Mother took the children with her to an appointment she had with Teresa Morrow, a family services coordinator with Friends of the Family. Ms. Morrow watched Mother and the children from her window after they arrived in the parking lot. She saw W.S. lying in the parking lot and screaming as Mother yelled at him to get up and clean a mess he had made in the back seat of the car. When W.S. got up and began to walk toward the car, Mother pulled him by his arm to the car in a manner that caused Ms. Morrow concern. After Mother and the children entered Ms. Morrow's office, Ms. Morrow noticed that W.S. had a mark on his face and a mark over his eye that could have been a black eye. When she asked Mother what had happened to W.S., K.A.S. replied that W.S. had fallen off the bed and then down the stairs. Mother also indicated that W.S. had fallen.

TDPRS became involved with Father and Mother on November 1, 2001 after receiving three separate reports concerning the family. The first report concerned emotional abuse and domestic violence in the home, as well as Mother's history of noncompliance in taking her medications for her bipolar condition. The second report concerned K.A.S.'s suicidal tendencies and her diagnosis of post-traumatic stress disorder because of the situation in her home. The third report concerned physical abuse of W.S.

Kimberly Sheppard, a TDPRS investigator, interviewed the family in their home. When she asked about W.S.'s injuries, Mother told her that W.S. was injured when he fell from the toilet and hit the toilet or the bathtub. W.S. told Ms. Sheppard that "mommy" hurt his eye. Mother told Ms. Sheppard that she and Father fought and had arguments in front of the children and that she yelled at, cussed at, and called the children names. Father minimized the couple's fighting, but did say that Mother may have slapped the children. Mother claimed to have been compliant with her medications for the past two months, but admitted that she was missing two of her prescriptions and was currently not compliant. Father told Ms. Sheppard that he was not taking medication for any mental health conditions because he did not believe in taking medi-

cation. Mother signed a safety plan, but Father did not.

After determining that there were no services TDPRS could provide the family that would ensure the children's safety, TDPRS removed the children from the home. In November 2001, K.A.S., who is bipolar, was placed in a therapeutic foster home with Mr. and Ms. Quillin, and J.G.S. and W.S. were placed with Ms. Buford.

On January 14, 2002, K.A.S. told Ms. Quillin that Father had bruised her privates a lot in the past. The next day K.A.S. told Mr. Quillin, in Ms. Quillin's presence, that Father had put his fingers in her several times and his penis in her just once. Later that day, K.A.S. corrected this statement by saying that Father put his penis in her several times. When Mr. Quillin asked K.A.S. if she had told anyone, K.A.S. said that she had told Mother. Ms. Quillin informed K.A.S.'s counselor of the alleged sexual abuse.

Father and Mother were generally allowed one hour each week to visit with their children. Those visits were usually chaotic and loud, with no consequences for the children when they engaged in inappropriate behavior. At the visitation following K.A.S.'s outcry, K.A.S. confronted Father and Mother about the alleged sexual abuse. Father said nothing, and Mother denied that it had happened.

In April 2002, approximately five months after the children were removed from the home, Father physically assaulted Mother. Mother left home and spent several days at a Friends of the Family shelter. Mother did not pursue any charges against Father at that time because she feared it would negatively impact her ability to be reunited with her children.

In June 2002, Father moved out of the house and stayed with his mother. Father later told Mother that he had an inspiration from God that if he and Mother moved back in together, they would get their children back. In September 2002, Father moved back in with Mother.

Less than a month later, the case was tried to the court, and after several days of testimony, the trial court determined that both Father's and Mother's parental rights should be terminated. On October 31, 2002, the trial court entered a termination order. This appeal followed.

### III. BURDEN OF PROOF IN TERMINATION PROCEEDINGS

■ A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982); *accord Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985). The United States Supreme Court, in discussing the constitutional stature of parental rights, states, "[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000). Nonetheless, while parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex.2002). Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right. *Id.*

■ In proceedings to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, TDPRS must establish one or more of the acts or omissions enumerated under subsection (1) of the statute and must also

prove that termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001; *Swate v. Swate*, 72 S.W.3d 763, 766 (Tex.App.-Waco 2002, pet. denied). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987). Because of the elevated status of parental rights, the quantum of proof required in a termination proceeding is elevated from the preponderance of the evidence to clear and convincing evidence. *Santosky*, 455 U.S. at 746, 102 S.Ct. at 1391; *see also* TEX. FAM.CODE ANN. § 161.001.

■ Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex.2002); *C.H.*, 89 S.W.3d at 25. This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard in criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex.1979); *In re D.T.*, 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2001, pet. denied) (op. on reh'g). While the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570. Termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re A.V.*, 849 S.W.2d 393, 400 (Tex.App.-Fort Worth 1993, no writ).

## IV. LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE

Father and Mother both contend that the evidence is legally and factually insufficient to support the trial court's findings that they: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their emotional or physical well-being; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their emotional and physical well-being; and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the children's return. *See* TEX. FAM.CODE ANN. § 161.001(1)(D), (E), (O). Father and Mother also contend that the evidence is legally and factually insufficient to support the trial court's finding that termination is in the best interest of the children. *See id.* § 161.001(2).

### A. Standard of Review

■ The Texas Supreme Court recently clarified the appellate standards of review to be applied to legal and factual sufficiency of the evidence challenges in light of the clear and convincing evidence burden of proof in termination proceedings. *J.F.C.*, 96 S.W.3d at 264–68 (discussing legal sufficiency review); *C.H.*, 89 S.W.3d at 25 (discussing factual sufficiency review). Because termination findings must be based upon clear and convincing evidence, not simply a preponderance of the evidence, the supreme court has held that the traditional legal and factual standards of review are inadequate. *J.F.C.*, 96 S.W.3d at 264–65; *C.H.*, 89 S.W.3d at 25. Instead, both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof. *J.F.C.*, 96 S.W.3d at 265–66; *C.H.*, 89 S.W.3d at 25. With respect to a legal sufficiency point,

we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.*, 96 S.W.3d at 266. In determining a factual sufficiency point, we must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing and then determine whether, based on the entire record, a fact finder could reasonably form a firm conviction or belief that the parent violated one of the provisions of section 161.001 and that the termination of his or her parental rights would be in the child's best interest. TEX. FAM.CODE ANN. § 161.001; *C.H.*, 89 S.W.3d at 25.

### B. Evidence Regarding Endangering Environment and Course of Conduct

We first review the evidence supporting the trial court's findings that Father and Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that they engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See* TEX. FAM.CODE ANN. § 161.001(1)(D), (E).

■■■■ Endangerment means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex.1996). Under subsection (D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *D.T.*, 34 S.W.3d at 632. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex.App.-Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See id.; Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.-Fort Worth 1984, writ ref'd n.r.e.).

■■■■ Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re R.D.*, 955 S.W.2d 364, 368 (Tex.App.-San Antonio 1997, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83–84 (Tex.App.-Dallas 1995, no writ). Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. TEX. FAM.CODE ANN. § 161.001(1)(E); *D.T.*, 34 S.W.3d at 634; *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex.App.-Eastland 1999, no pet.).

■■■■ However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533. To determine whether termination is necessary, courts look to parental conduct both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex.App.-Fort Worth 2001, no pet.).

■■■■ Because the evidence is interrelated concerning these two statutory grounds for termination, we consolidate our examination of the evidence as to both grounds. *In re S.D.*, 980 S.W.2d 758, 762 (Tex.App.-San Antonio 1998, pet. denied); *In re B.R.*, 822 S.W.2d 103, 106 (Tex.App.-Tyler 1991, writ denied) (recognizing the link between a parent's conduct and a child's conditions and surroundings).

There was uncontroverted evidence that Father began physically abusing Mother shortly after they married. Father hit Mother, kicked her, beat her with his fists, choked her, held a knife to her side as she held a child, picked her up and threw her to the ground, held her against her will, threatened her, and hit her once when she was pregnant. Mother also struck Father, yelled at him, called him names, and once threw knives at him. Father received probation in 1995 for assaulting Mother as she was holding J.G.S., and Mother sought a protective order against Father in November 1996. In early 1997, Mother voluntarily committed herself to a mental hospital because of her desire to hurt Father.

Five months after the children had been removed from the home, Father physically assaulted Mother in April 2002, and Mother sought refuge in a shelter. Father and Mother fought and argued in front of the children, which scared the children and made them very sad. Father testified that the domestic violence in the home hurt the children "really bad" and was the cause of some of the children's behaviors. Father also acknowledged that the fighting and assaultive behavior in the home was emotional abuse of the children. Mother admitted that K.A.S. attempted suicide because of the domestic violence in the home. Mother also acknowledged that the life she and Father lived created some long-term problems for their children.

Mother, who had been diagnosed with bipolar disorder, suffered from uncontrollable rages and delusional thoughts. Whenever Mother went into an uncontrollable rage, she did not later remember what had happened. For example, Mother spent ten days at a mental hospital in the spring of 2001 after K.A.S. burned herself while helping prepare dinner. Mother told the mental healthcare workers that she had punched K.A.S. like a punching bag, but later she did not remember either the incident or making the statement. Mother later returned to the mental hospital for four days because she was afraid for the others in her household if she went home. Mother trained the children to go into their rooms and lock the door or to go to a neighbor's house when she raged because she did not want to hurt them. Mother testified that the children needed to be safe from her when she raged, and she told her Friends of the Family counselor that she was a danger to her children.

Mother was the children's primary caregiver. She yelled and cursed at the children and called them names. She told her Friends of the Family counselor that she could not handle the children, especially K.A.S., and that she had slapped K.A.S. in the face. Mother stated at trial that ninety per cent of K.A.S.'s problems were because of her.

Father saw the children only on Sundays because he worked six days a week, leaving before the children woke up and coming home after they had gone to bed. Father questioned Mother's stability and parental abilities because she was not compliant in taking her medications, and he characterized Mother as a "different person" when she was not on her medication. Father continued, however, to leave the children with her. Father testified that Mother was prone to rages and that the family tiptoed around her in an effort not to make her mad. Father told the TDPRS investigator that Mother may have slapped the children.

When Father was with the children, he spanked them with a belt and a wooden spoon, leaving bruises on K.A.S. and J.G.S., and punished J.G.S. by making her stand on her "tippy toes" for about a minute. Father called the children names, accused them of things, and hit the children during rough play. The CASA child

advocate testified that during Father's visits with the children, Father inappropriately grabbed his daughters in their crotch area during play. A Child Protective Services ("CPS") caseworker also expressed concern about the way Father touched his daughters during the visits. When questioned about this touching, Father replied that he touched his children all over their bodies and that he enjoyed his "whole" child.

From the time she was taken from her parents, K.A.S. told first the CASA child advocate, and then her foster parents, that she had a secret and that Father had done something to her. K.A.S. eventually told her secret to her foster parents: Father had sexually assaulted her by putting his fingers and penis in her. K.A.S. subsequently role-played the sexual abuse for her foster care therapist. When K.A.S. confronted her parents about the sexual abuse, Father said nothing, and Mother denied that it had happened. Mother later told K.A.S. that K.A.S. was confused and must have dreamed about the sexual abuse when she was a baby or that K.A.S.'s foster mother was just putting things into K.A.S.'s head. One CPS caseworker testified that Mother went back and forth about whether she believed the sexual abuse had occurred. After being confronted about the sexual abuse, and even though he had been instructed not to mention the sexual abuse allegations during the visits, Father ended the visits with a prayer, asking God to forgive K.A.S. for lying and praying that K.A.S. would tell the truth.

At trial, Father stated that K.A.S. lied in general and that she lied about the sexual abuse. K.A.S.'s foster father testified that K.A.S. lied on occasion, but her foster mother testified that K.A.S. only had a problem with lying since July 2002, which was approximately six months after K.A.S. first made the sexual abuse allegation.

Although K.A.S. recanted her allegations of sexual abuse, she later asserted that her allegations were true. A CPS caseworker testified that it is very common for children to recant. The doctor who examined K.A.S. testified that a physical examination showed no scarring from sexual abuse, but explained that there was often no such scarring. A clinical psychologist who performed psychological evaluations on both Father and Mother stated that he did not "have any sense" that there was any sexual abuse or drug abuse, but he was concerned about the "volatility in the home."

Amy Teel, who had counseled K.A.S. and J.G.S. for the eleven months before they were removed from the home, testified that the children's emotional well-being worsened throughout the time she saw them. Both children expressed sadness and fear about the fighting at home. K.A.S. also seemed overly mature for her age.

In November 2001, the month the children were removed from the home, K.A.S. was diagnosed by Dr. Chua, a psychiatrist, with bipolar disorder and post-traumatic stress disorder. In December 2001, Dr. Polakoff, a clinical psychologist, conducted a psychological assessment of K.A.S. during which K.A.S. told Dr. Polakoff that she felt sick inside when her parents fought, that she thought about killing herself when Father became angry, that she wanted to kill herself, and that she had been thinking about killing herself since she was three years old. Dr. Polakoff diagnosed K.A.S. with bipolar disorder and anxiety disorder.

Dr. Polakoff conducted an assessment of J.G.S. in February 2002. J.G.S. said that her parents called the children names, such as "dumb" and "stupid," and that made her feel "not good." Dr. Polakoff

diagnosed J.G.S. with depressive disorder, which stemmed from a history of abuse and separation from primary attachment figures and her sister.

Dr. Polakoff assessed W.S. in April 2002. W.S. showed no breadth of emotion, and his adaptive behavior was severely delayed by approximately one year. Dr. Polakoff diagnosed W.S. with depressive disorder related to chaotic family of origin, lack of stability in the home, and separation from primary attachment figures and from his older sister.

We have carefully reviewed the entire record. Looking at all the evidence in the light most favorable to the trial court's findings, giving due consideration to evidence that the fact finder could reasonably have found to be clear and convincing, we hold that a reasonable trier of fact could have formed a firm belief or conviction that both Father and Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that they also engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being.

 Although Father and Mother challenge the legal and factual sufficiency of all three of the statutory grounds for termination pleaded by TDPRS, only one finding under section 161.001(1) is necessary to support a judgment of termination. TEX. FAM.CODE ANN. § 161.001(1); *D.M.*, 58 S.W.3d at 813; *In re S.F.*, 32 S.W.3d 318, 320 (Tex.App.-San Antonio 2000, no pet.); *see also Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990) (op. on reh'g). Because we conclude there is both legally and factually sufficient evidence to support the trial court's findings under family code section 161.001(1)(D) and (E), we need not address Father's and

Mother's remaining points with respect to the trial court's finding under section 161.001(1)(O). TEX. FAM.CODE ANN. § 161.001(1)(D), (E), (O); *see* TEX.R.APP. P. 47.1.

**C. Evidence Regarding Best Interest of the Children**

 Judicial inquiry as to the best interest of the children is deferred pending determination that the petitioner has sufficiently established one or more of the acts or omissions enumerated in subdivision one of the statute. *See D.T.*, 34 S.W.3d at 640–41. Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the future;

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976). These factors are not exhaustive, some listed factors may be inapplicable to some cases, and other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Fur-

thermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the children. *Id.* On the other hand, the presence of scant evidence relevant to each *Holley* factor will not support such a finding. *Id.*

### 1. Children's desires

K.A.S. told her foster care mother "I want to go home, but I know that it wouldn't be the best thing for me. I don't want to hurt my family." After making the sexual abuse allegation, K.A.S. did not want to go to the family visits; they were traumatic and disturbing for her. At one visit, K.A.S. told Father that she would never forgive him for all the things he had done to her.

J.G.S. told her counselor that if she had fifty dollars, she would give it to the judge so she could go home. J.G.S. also said that if she did go home, she did not want her parents to be "rude," such as when Father spanked her and made her stand in the corner on her tippy toes. The CASA child advocate testified that J.G.S. just wanted to know what was going to happen to her. W.S. was too young at the time of trial to determine his desires. He did not pay attention to either of his parents during the visits.

At first, the children were excited when they saw their parents at the parental visits. After the first month, however, the children were not sad when the visits ended. The children were ready to leave, sometimes looking at the clock and asking if it was time to go yet. They would run out of the room and have to be told to hug their parents.

### 2. Emotional and physical needs

Several health care professionals testified about the children's emotional and physical needs. The record contains expert testimony that K.A.S. would need a safe, stable, consistent, nurturing, and highly-structured environment because of her bipolar and post traumatic stress disorders. Living in a chaotic home or with domestic violence would be bad for K.A.S. J.G.S. needed to be in a stable and structured home where her feelings are validated and allowed to be verbalized. W.S. needed stability and structure in his household and ongoing play therapy to overcome obstacles and deal with his mental health issues.

### 3. Emotional and physical dangers

K.A.S. alleged that Father had sexually assaulted her and that she attempted suicide because of the domestic violence in her home. The CASA child advocate testified that she feared for the children's safety if they were returned to their parents and worried that the children would "pay for" K.A.S.'s sexual abuse allegations. Father denied the allegations and tried to portray K.A.S. as a liar. Mother also denied the allegations and did nothing to protect K.A.S. from Father.

Father left the children with Mother, even though he knew that Mother was not compliant in taking the medications for her bipolar disorder and that when she was not taking her medication, she had rages and struck the children. Both parents verbally abused the children. Furthermore, the fighting and physical abuse between Father and Mother was extreme and ongoing, often witnessed by the children, and resulted in emotional problems for all three children.

### 4. Parental abilities and inappropriate parent-child relationship

Father did not have a close relationship with any of his children and saw them only one day a week before they were removed from the home. When he did see them, he called them names, accused them of things, and spanked them with a belt or wooden

spoon. K.A.S. alleged that Father had sexually assaulted her.

At the family visits, when Mother would try to correct the children, Father would indicate the opposite to them. For example, when Mother would tell one of the children to do something, Father would counter by telling the child she did not have to do what Mother said. Father also told the children that they did not have to obey the social workers and told K.A.S. that she did not have to obey her foster parents. When K.A.S. tried to tell her parents she was angry, her parents told her that it was okay to be angry but that it was not their fault. Father continued to raise the sexual assault allegations during the parental visits, despite having been instructed not to do so. Father also made the children cry during the parental visits by speaking harshly to them, and the children were often injured during rough play with Father. Father also touched the girls' crotches while playing with them during the parental visits.

Father admitted being addicted to pornography, especially lesbian pornography, since the age of ten. He and Mother often fought over his viewing pornography on the Internet. Father claimed that he stopped viewing pornography eight months before trial and that it was more difficult for him to break the addiction to pornography than when he quit marijuana, cocaine, and some of the "most hardest drugs you have ever done."

Father made only three of his ten court-ordered $150 monthly child support payments and offered no explanation for his failure to pay. Father earned $9,000 in the three months before trial and, in the month before trial, bought a $300 camcorder, spent $100 for a computer, and began paying $100 per month for DSL cable, but made no child support payment.

Dr. Foster testified that Mother had a high level of self-centeredness, and there were indications that she was the type of person who tended to consider her own needs first and foremost. Dr. McCreary, a clinical psychologist, testified that Mother's historical and current mental health difficulties would make it hard for her to be an effective parent, even with the services that were being provided to her. Furthermore, he questioned whether Mother could handle K.A.S. because an eight-year-old child with bipolar disorder and post-traumatic stress disorder would contribute to whatever problems were in the home.

Mother experienced uncontrollable rages during which she was unaware of her actions or words, and there was testimony that during some of these rages she physically assaulted K.A.S. Mother trained the children to seek shelter from her when she was in a rage. Even when not in a rage, Mother yelled and cursed at the children, called them names, and accused them of things. J.G.S. was Mother's favorite child, and at the time the children were removed from the home, Mother did not have a normal connection with or feeling toward K.A.S. or W.S.

After the children were removed from the home, Mother obtained and kept a job and was able to pay for all of her living expenses except for her car payment, which Father made for her. She separated from Father after he physically assaulted her several months after the removal. However, she reconciled with him shortly before trial.

### 5. Available programs

After the children were removed, Father completed parenting classes and attended a batterer's intervention program and counseling. He missed two counseling sessions, which resulted in that program being cancelled. Father and Mother both

testified that Father benefitted from these services. Nevertheless, during visits with the children, Father did not use the skills taught him in the parenting classes and he did not comply with requests to stop referring to K.A.S.'s sexual abuse allegations during the visits. The CASA child advocate testified that Father was always angry during the visits, he snapped at the children and said things to make them cry, and the children were afraid of him. Father was frequently confrontational with others, including K.A.S.'s foster mother. Father also continued to batter Mother, and she spent several days in a shelter after he assaulted her in April 2002. According to the CASA child advocate, Father never got anything out of the services that were provided to him.

After the children were removed, Mother attended court-ordered programs and voluntarily attended other programs, some of which she did not complete. There was testimony that Mother did not get anything from these services until they were almost finished, that Mother did not implement the strategies she learned in counseling and parenting classes during the visits with the children, and that Mother had not demonstrated an ability to change the behavior that resulted in the loss of her children. A CPS case worker determined that there were no available services that would ensure the children's safety.

### 6. Plans for the children

Father planned to find a job that took up less of his time when his children were returned. He did not know what type of job that might be. He opined that he might be able to make $35,000 working at McDonald's, but he had not applied there or for other jobs.

Father also planned to go to counseling as a family, and he and Mother planned to get the children involved in some programs at the University of North Texas.

Father did not know any details about those programs, however.

Father testified that his mother, grandfather, and three unnamed friends were available to help the family when needed. Father's grandfather testified that he had seen his great-grandchildren each Christmas, he was planning to sell his house in Ohio in the spring and move near Father, and he was willing to help with the children. Father's mother, who lived nearby, also testified that she was willing to help with the children. CPS conducted a home study, but denied placement of the children with the grandmother. The CASA child advocate testified that J.G.S. was afraid of her grandmother and did not want to go near her during the visits and that the grandmother did not like J.G.S. The CASA child advocate also opined that the grandmother was trying to put on a front at trial that she was a good person, but she had lived near the family for the entirety of the marriage and had not attempted to stop the family violence in the household.

Father and Mother planned for the children to attend Bible study and to attend church up to four times each week. Both the pastor and assistant pastor testified that Father and Mother attended church frequently and that they would provide spiritual guidance.

Mother understood that the children needed long-term counseling, and she planned to see to it that the children would get the counseling they needed. She also planned to set aside time for each of the children and had prepared a rules list, consequence list, and chore list for the children. She planned to provide medical insurance for the children, either through Medicaid, a check's program, or Father's employer. Mother also had arranged her work schedule so that she could be at

home when the children were home, and she testified that there was a day care facility across the street from the home. Mother also planned to continue her individual and marriage counseling.

Mother had no family in the area, but claimed to have four friends who would help her with the children. Mother had not known any of those friends for very long, and the friends characterized Mother's and Father's relationship as good, which was contradicted by Mother and Father's own testimony.

TDPRS planned for the children to be adopted if Father's and Mother's parental rights were terminated, but K.A.S. was a poor adoption candidate.

### 7. *Stability of home or proposed placement*

Father and Mother's home had a history of instability and domestic violence. The clinical director who performed psychological assessments of the three children testified that, because the children are unstable, it would be devastating for them to be returned to a chaotic family. K.A.S.'s psychiatrist also testified that it would be a bad thing for K.A.S. to be sent to a chaotic home or one with domestic violence. The clinical psychologist who evaluated Father expressed concern for the safety and security of the children in the home if Father and Mother continued to fight, be erratic, and ignore the children's needs.

Father and Mother were separated three times before the children were removed from the home, and once afterward. In June 2002, Father moved out of the house and stayed with his mother. He later told Mother that he had an inspiration from God that if he and Mother moved back in together, they would get their children back. In September 2002, less than a month before trial, Father moved back in with Mother.

The children were secure in their temporary placements in foster care. The CASA child advocate testified that W.S. was happy in his foster home and he was just starting to talk. She also testified that J.G.S. was so happy in her foster home that she was no longer stressed. The foster mother testified that both W.S.'s and J.G.S.'s behavior had improved since they had been in her home. J.G.S.'s counselor testified that J.G.S. was happy and that since being in foster care, her crying and sadness had diminished and she had improved emotionally.

K.A.S.'s therapist, who had seen K.A.S. weekly since December 2001, testified that there had been an extreme decrease in K.A.S.'s anxiety, an increase in her feelings of security, and she believed that K.A.S. was in a safe and supportive environment with the foster parents. K.A.S.'s therapeutic foster mother testified that she had no concerns about K.A.S. continuing to reside in her home, even though K.A.S. became aggressive and willfully disobedient in June 2002 and had some problems with lying and stealing since July 2002.

All three children behaved significantly better with their foster parents than they did with their parents, and they showed affection for and loved both their parents and their foster parents.

### 8. *Excuse for acts or omissions*

Father and Mother both testified that Father had become a new person, but Mother admitted that Father had only been that way for about one month before trial. In a bench trial, the trial court is the judge of the credibility of the witnesses and the weight to be accorded to their testimony. *Davis v. Travis County Child Welfare Unit,* 564 S.W.2d 415, 420–21 (Tex.Civ.App.-Austin 1978, no writ). A trial court can measure the future conduct of parents by their recent past conduct,

but is not required to believe that there has been a lasting change in a parent's attitude since his children were taken. *Id.* at 421.

Dr. Richard McCreary, a clinical psychologist who evaluated Father, diagnosed Father with adjustment disorder with anxiety and depressed mood and with a parent-child relational problem. Dr. McCreary noted that Father had some characteristics of an isolated or schizoid individual and opined that Father might resist full compliance at times.

Mother contends that four months before trial she finally found a medication that controls her bipolar disorder, and when she is on the proper medication, she can be a good mother to her children. Mother claimed that she had been compliant in taking this medication, with the exception of one week-end when she forgot to take it. Since Mother began taking this medication, she has obtained and kept a job and her demeanor has improved. However, there was extensive testimony that she had a history of noncompliance in taking her bipolar medications.

Mother began taking medication for her bipolar disorder on December 31, 1996. Dr. Sujatha Ramkumar, Mother's MHMR psychiatrist, testified that he had changed Mother's medications a number of times since he began treating her in November 2001, generally at her insistence. Dr. Ramkumar testified that none of Mother's requests were unreasonable, but she never gave the medications time to work. Dr. Ramkumar testified that Mother, like most persons with bipolar disorder, liked to change, and the reason Mother had been responsive to him was that he always agreed to her requested medication changes. Dr. Mark Foster, a psychologist who evaluated Mother in August 2002, testified that because of Mother's personality type, she would be a considerable risk for

not being medication compliant. Teresa Morrow, a Friends of the Family services coordinator, testified that Mother was a danger to her children if not on her medication.

Mother also argues that, even if Father's parental rights are terminated, hers should not be because Father was the source of the domestic violence and abuse. Father agreed that if ordered to do so, he would stay away from the children, and Mother testified that if it was necessary, to keep her children, she would leave Father and keep the children away from him. However, Mother and Father had separated several times before the children were removed and once afterward, but always reconciled. Mother exhibited a pattern of dependence on Father and failed to protect the children from him.

Having carefully reviewed the entire record, we conclude that there is both legally and factually sufficient evidence to support the trial court's finding under family code section 161.001(2) that termination of both Father's and Mother's parental rights is in the best interest of the children.

## V. CONSTITUTIONALITY OF ONE-YEAR DEADLINE

Father challenges the constitutionality of family code section 263.401, which requires the court to dismiss a termination-of-parental-rights case if it has not rendered a final order within one year after the suit was filed. TEX. FAM.CODE ANN. § 263.401(a). According to Father, the trial court erroneously denied his request for continuance and forced him to trial without adequate discovery or trial preparation in order to comply with the one-year deadline. Father contends that section 263.401 is unconstitutional as applied to him; thus, it violates his due process and due course of law rights because it imposes an arbitrary time limitation.

U.S. CONST. amend. XIV; TEX. CONST. art. I, § 19.

Mother argues that section 263.401 is unconstitutional as applied to her, a mentally ill person, because one year is not enough time for a mentally ill person to demonstrate that she can recover and meet the needs of her children. Mother also contends that section 263.401 violates her equal protection and due process rights because it imposes an arbitrary time limitation. U.S. CONST. amend. XIV.

Neither Father nor Mother raised these constitutional challenges in the trial court and thus have waived their rights to assert them on appeal. To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. TEX.R.APP. P. 33.1(a); *see also* TEX.R. EVID. 103(a)(1). If a party fails to do this, error is not preserved, and the complaint is waived. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g); *see also In re B.L.D.*, 113 S.W.3d 340, 354–55 (Tex.2003), *petition for cert. filed*, (Nov. 19, 2003) (No. 03–8432) (holding that court of appeals must not retreat from error-preservation standards to review unpreserved error in parental rights termination cases); *In re D.T.M.*, 932 S.W.2d 647, 652 (Tex.App.-Fort Worth 1996, no writ) (holding that even constitutional arguments are waived if not raised in the trial court).

## VI. CONCLUSION

We overrule all of Father's and Mother's points on appeal and affirm the trial court's order terminating their parental rights.