In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No.
06-11-00002-CV

                                                ______________________________

 

 

 

                                                  IN
RE:  CARLOS A. ARMENTA

 

 

                                                                                                  


 

                                                                                                                            


                                                     Original
Mandamus Proceeding

 

                                                                                                  


 

 

 

 

                                          Before
Morriss, C.J., Carter and Moseley, JJ.

                                              Memorandum
Opinion by Justice Carter

                                                                              

                                                                              








                                                     MEMORANDUM 
OPINION

 

            While incarcerated in the Telford
Unit of the Texas Department of Criminal Justice (TDCJ), Carlos A. Armenta was
allegedly assaulted by another prisoner.  Armenta brought suit against the TDCJ and a
guard, Walter Ayers, claiming that the TDCJ and Ayers “misused property” and
negligently failed to follow procedure, improperly supplied electricity to an
outlet in the alleged assailant’s cell, and ignored Armenta’s warnings that the
assailant would attack him. The TDCJ moved to dismiss Armenta’s claims against
it, arguing that it could not be sued under 42 U.S.C. § 1983.  In his response, Armenta argued that “he did
not sued [sic] TDCJ but under Tex. Civ. Prac.
Rem. Code Ann. §101.021(2).”  The
trial court granted the TDCJ’s motion and dismissed it from the suit, leaving
Ayers as the sole defendant.

            In Armenta v. TDCJ-ID, No. 06-10-00039-CV, 2010 WL 1986638 (Tex.
App.––Texarkana May 19, 2010, pet. denied) (mem. op.), Armenta appealed the
dismissal.  However, this Court dismissed
his appeal for lack of jurisdiction because the trial court’s dismissal order
did not dispose of all named defendants, and therefore, it was not a final,
appealable judgment.  Id. 

            Here, Armenta seeks mandamus relief,
arguing, as he did in his direct appeal, that the trial court:  (1) “erred and abused its discretion in
dismissing defendant TDCJ from the suit”; and (2) failed to analyze and
correctly apply the law regarding “whether Armenta has standing to suit [sic] TDCJ
for negligence and misuse of property pursuant to Tex. Civ. Prac. Rem. Code Ann. § 101.021.(2).”

            We deny the petition for writ of
mandamus because Armenta has an available remedy by appeal. 

            Mandamus is an extreme remedy, and
to be entitled to mandamus relief, a petitioner must show that the trial court
clearly abused its discretion and that the relator has no adequate remedy by
appeal.  In re McAllen Med. Ctr., Inc., 275 S.W.3d 458 (Tex. 2008) (orig. proceeding).  Armenta may appeal the dismissal of the TDCJ
when the trial court enters a final judgment disposing of all claims and all parties.  See
Lehmann v. Har-Con Corp., 39 S.W.3d
191, 195 (Tex. 2001); Jack B. Anglin Co.
v. Tipps, 842 S.W.2d 266, 272 (Tex. 1992). 
Armenta does not cite to any authority demonstrating that the available
remedy by appeal is inadequate in this case, and we are aware of none.  Accordingly, we deny the petition for writ of
mandamus. 

 

 

                                                                        Jack
Carter

                                                                        Justice

 

Date
Submitted:          January 18, 2011

Date
Decided:             January 19, 2011

 






e friends. J.M. "manifested what we call sadistic features" on one of the evaluation
tools. He explained that people with such features often enjoy watching movies in which others
suffer and may enjoy such in real life. Later, he would explain that the Department took this
observation out of context when it used that finding as a basis to remove S.M.M. J.M. described
himself to Winsted as apathetic. Further, Winsted observed that from J.M.'s perspective, he has a
lot of problems with his children or raising children with lots of problems. As a result, he is likely
to see his children in a "negative light." 

 Winsted testified that it was difficult to conclude whether J.M. would be able to meet
A.L.M.'s emotional needs. He could not determine whether J.M. was defensive at the evaluation
because "the stakes were very high" or whether that was his general nature. If it is his general nature
to be defensive, then it would be difficult for J.M. to meet A.L.M.'s emotional needs. J.M. "could
probably provide for [the] physical [needs]" of the children. Winsted testified he "would question
the emotional and mental [needs], though, explaining that those needs would be "a challenge for him
as well." 

 3. Dr. Winsted's Conclusions Regarding Parenting

 On cross-examination, Winsted testified that these psychological evaluations provide a
snapshot of the patient in terms of "emotional" observations, pointing out that cognitive and
personality observations are more fixed. He testified that with six to nine months of service, a
patient's intellect would not vary. There can "certainly be some improvements" in personality
functioning, however. It would take most patients, including K.M. and J.M., a couple of years for
significant change to occur. Winsted testified that it is in the area of emotional function where the
most improvement may be seen in the shortest period of time; depression and anxiety can improve
significantly in a matter of months with cognitive behavior therapy. 

 Importantly, following his evaluations, Winsted concluded that K.M. and J.M. could parent
S.M.M. as long as S.M.M. did not have any "significant medical problems." 

 [P]eople that have that [cognitive] function and that level do tend to have some
struggles or difficulties with raising children and generally do need some kind of
extra help. 


 . . . .


 The other thing I'd like to say though is the issues, especially with [K.M.], that she's
struggling with [are] probably going to require in addition to [help from church
members], which is very important to have a good support community, [are] going
to require some professional therapeutic intervention as well.

 

 


 4. Evaluating this Evidence

 Winsted's testimony is sufficient to show that K.M. and J.M. do suffer from a mental
deficiency. However, it fails to establish by clear and convincing evidence that the parents are
unable to meet the needs of the children. In fact, with respect to S.M.M., the doctor's testimony
indicates that in his opinion, K.M. and J.M. can adequately parent him. With respect to A.L.M., the
doctor's testimony suggests that certain aspects of parenting will be a challenge for the parents. 
Evidence that parenting may be difficult, though, falls short of forming a firm belief or conviction
that K.M. and J.M. are unable to meet the needs of the children.

 E. Evidence of Exposure of Children to Alleged Sex Offender and Convicted Sex
Offender


 Testimony from K.M. and J.M. fails to meet the elevated standard of proof to support
termination. Likewise, testimony from those associated with the Department and S.M.M.'s foster
mother fails to establish by clear and convincing evidence that K.M. and J.M. are unable to meet the
needs of the children. Finally, as we have just seen, Winsted explained that he believed that K.M.
and J.M. are capable of parenting S.M.M., but may face some challenges meeting the needs of
A.L.M. Again, recognizing that parenting in general is fraught with challenges, we conclude that
testimony that certain aspects of parenting may be difficult for a parent is legally insufficient to
support termination. We are left, then, with the task of evaluating the evidence that K.M. and J.M.
exposed the children to the accused abuser of B.L.S. and to J.M.'s father, a convicted sex offender. 


 We note that the State relies a great deal on the parents' repeated reliance on family members,
one who had been accused of sexually abusing the boy's older sister, B.L.S., and another being J.M.'s
father, a registered sex offender. (12) We begin by noting that there is not the slightest evidence of
abuse of any of the three children at the hands of J.M.'s father, de la Rosa. There is no evidence or
allegation of Robertson's abuse of A.L.M., and there is no evidence that S.M.M. has ever had any
contact whatsoever with Robertson. S.M.M. only lived with his mother and father for three months,
and during that time, they were living with the maternal grandparents and later in their own
apartment. 

 With that, we are left to evaluate evidence of the parents' exposure, several times over a
number of years, of the oldest child (again, whose relationship is not at issue) to her accused abuser. 
We neither minimize the impact such exposure may have had on the oldest child, nor do we suggest
that such exposure would not have an impact on a younger sibling. Again, we point out that this is
not a case in which we focus on endangerment under Section 161.001 in which exposure of B.L.S.
to abuse may serve as evidence that the parents endangered the younger children. See In re A.S., 261
S.W.3d 76, 88 (Tex. App.--Houston [14th Dist.] 2008, pet. denied); In re K.A.S., 131 S.W.3d 215,
222 (Tex. App.--Fort Worth 2004, pet. denied). In the endangerment cases, the decision to
terminate the parent-child relationship does not require that the endangering conduct be directed
toward the child, but it does require that it be committed in the presence of the child. A.S., 261
S.W.3d at 88. 

 Here, we must look at the parents' overall failure to provide for the needs of the children at
issue.

 In affirming termination under Section 161.003, the Salas court mentioned that along with
a wealth of other supporting evidence, the mother was unable to prevent the sexual and physical
abuse of her children. See Salas, 71 S.W.3d at 790. So, while we recognize that prevention of abuse
may be a consideration here, with respect to A.L.M. and S.M.M., we have no evidence that the
parents failed to prevent abuse. S.M.M. was born January 11, 2008, and the Department removed
him from the home less than three months later. So the record shows S.M.M. was not born when
the family lived with or near any abuser or offender. Nothing in the record suggests that A.L.M. or
S.M.M. experienced sexual or physical abuse. There was no evidence in the instant case, or even
any allegation, that A.L.M. or S.M.M. experienced any abuse. 

 Section 161.003 of the Texas Family Code requires more than a finding of mental deficiency. 
That is, we are called on to decide by clear and convincing evidence that because the parents were
mentally deficient, they were unable to prevent exposing their oldest child to the family member she
accused of sexually abusing her and that such evidence supports a finding that the parents are now
rendered unable to provide for the physical, emotional, and mental needs of the children. This is a
difficult matter to prove since it first requires proof that the exposure to sexual abuse of the older
child was not mere negligence, inattention, or poor parenting, but that it happened because the
parents were mentally deficient. Upon making that linkage, there must also be evidence to support
a determination that the parents' mental deficiencies exclude them from now and in the future
providing for their children. It is theoretically possible that a parent's mental deficiency might
indirectly cause abuse of a child--generally expert testimony is presented to make that connection. 
M.F.G. v. Dep't of Children & Families, 723 So. 2d 290, 292 (Fla. Dist. Ct. App. 3d Dist. 1998)
(based on expert testimony and D.H.G.'s own incoherent responses, trial court found by clear and
convincing evidence D.H.G. suffered from severe and chronic mental disorder and that she was
unable to provide reasonable care for her children); In re N.F., 533 N.E.2d 952 (Ill. App. Ct. 2d Dist.
1989) (court relied on psychiatrist's testimony that mother could not independently parent her child). 
A primary reason for allowing an expert to give opinion testimony is to make a causal connection
between the act or event and the resulting damage or injury. Causal connection must rest in
reasonable probabilities; otherwise, the inference that such actually did occur can be no more than
speculation and conjecture. Ins. Co. of N. Am. v. Myers, 411 S.W.2d 710, 713 (Tex. 1966). Here,
Winsted's testimony, previously summarized, does not opine that the parents' mental deficiencies
render the parents unable to provide for the physical, emotional, and mental needs of the children. 
In fact, in February 2008, after his psychological evaluation was completed, Winsted expressed the
opinion at a staff meeting that K.M. and J.M. could parent S.M.M. (13) While we are not holding that
expert testimony is always essential in a termination case of this sort, the other evidence in this case
consists primarily of conclusory statements by lay witnesses. (14)

 Here, there is some evidence that the parents were unsure whether the abuse ever happened,
especially initially when the Department's investigation suggested that it did not. Further, even after
they began to believe the allegations, financial situations "[l]eft them no choice but to rely on family
for shelter." Certainly, we cannot say that financial difficulties are the equivalent of mental
deficiency or that the record shows the parents' mental deficiencies were the direct cause of their
financial difficulties.

 There is no evidence that the parents continued to expose the oldest child to an environment
in which her accused abuser was living because of their mental deficiencies. That is, nothing in the
record would prove their mental deficiencies were the reason for their decision to bring B.L.S. into
the household where Robertson was living. K.M. and J.M. admit that it was a mistake. It was an
instance in which the parents did not meet the needs of their children, especially as to B.L.S. But
there is no evidence that due to their mental deficiencies, they were unable to meet the needs of the
children, only that with respect to this situation they failed to do so. Regarding A.L.M. and S.M.M.,
the evidence does not suggest that contact with Robertson, the alleged abuser, in any way
compromised their need for safety and protection. No allegations were made that either son was
abused. Further, there is no evidence the family had contact with Robertson after S.M.M. was born.

 We find there is not sufficient evidence to allow a trier of fact to reasonably form a firm
belief or conviction about the truth of the allegations concerning the termination of parental rights. 

IV. CONSERVATORSHIP 

 The trial court also appointed the Department as the managing conservator of A.L.M. and
S.M.M. The remaining question is whether that order continues to control independent of the
termination decision or if the reversal of the termination order necessarily requires reversal of the
conservatorship decree. 

 The Texas Supreme Court has spoken on this matter very recently. The first case addressed
was In re J.A.J., 243 S.W.3d 611 (Tex. 2007). In that case, an order terminating the parents' rights
was reversed, and even though the parent did not raise an issue regarding the conservatorship
appointment, the Texas court of appeals reversed the order appointing the Department as managing
conservator. The Texas Supreme Court held that the Department had pled and the trial court had
found a ground for the conservatorship order that was independent from the termination order and
reversed the court of appeals. (15)

 The next year, the Texas Supreme Court addressed another termination case, but in this
instance, there was no independent ground for the appointment of a managing conservator. The
appointment was made pursuant to Section 161.207 of the Texas Family Code, which requires the
appointment of a managing conservator when a termination of parental rights is granted. Since there
was no other ground for the conservatorship order, it was subsumed in the appeal of the parental
rights termination order and reversal of the termination necessarily required reversal of the
conservatorship award. In re D.N.C., 252 S.W.3d 317, 319 (Tex. 2008). 

 In this case, the Department pled that it be named as the managing conservator "pursuant to 

Sections 153.005 and 263.404, Texas Family Code . . . ." Section 153.005 defines the parties
authorized to be appointed as managing conservators ("a parent, a competent adult, an authorized
agency, or a licensed child-placing agency"). Section 263.404 has been held to apply only when the
trial court does not order termination of the parent-child relationship, and has no application when
the parental rights have been terminated. J.A.J., 243 S.W.3d at 615. Furthermore, the trial court,
in appointing the Department as managing conservator, did not find any grounds for the
conservatorship independent of the termination. Since the court terminated the parental rights,
Section 263.404 did not apply and the court was required to appoint the managing conservator in
accordance with Section 161.007, due to the termination. Here, like D.N.C., the conservatorship
issue was subsumed with the termination issue and there was no independent ground for
conservatorship. (16)
 Consequently, the appointment of the Department as managing conservator is
reversed. 

 The effect of our judgment will reverse the order of termination and therefore invokes
another section of the Texas Family Code. When an order of termination is denied, the trial court
is to "render any order in the best interest of the child." Tex. Fam. Code Ann. § 161.205 (Vernon
2008). An appellate court reviewing a matter months later is not equipped to know if circumstances
of the parents or the children have changed since the trial court entered its order. Such a
determination requires a fact-finder. Therefore, we remand the case to the trial court for the limited
purpose of rendering an order, consistent with Section 161.205 of the Texas Family Code. A.S., 261
S.W.3d at 93. 

V. CONCLUSION

 The record reveals that K.M. and J.M. may have made certain parental missteps, especially
with respect to B.L.S. Assuming without deciding that those missteps could serve as a failure to
meet the needs of the two younger children, we nonetheless conclude that none of those missteps is
directly linked to the parents' mental deficiencies. That is, the evidence is not clear and convincing
that as a result of their mental deficiencies, K.M. and J.M. are unable to meet the needs of the two
younger children. We are mindful that the evidence must be clear and convincing to terminate
parental rights, rights characterized as "far more precious than any property right." Santosky v.
Kramer, 455 U.S. 745, 758-59 (1982); see Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). 

 Having concluded that the evidence is legally insufficient to support termination based on
Section 161.003, (17) we reverse the trial court's judgment and render judgment denying the
Department's petition seeking termination of K.M.'s and J.M.'s parental rights to A.L.M. and S.M.M.

Further, for the reasons expressed, the appointment of the Department as managing conservator is
reversed, and the case is remanded to the trial court to proceed pursuant to Section 161.205 of the
Texas Family Code.



 Jack Carter

 Justice


Date Submitted: August 5, 2009

Date Decided: November 20, 2009
1. K.M. signed an affidavit of relinquishment of her parental rights to B.L.S. to facilitate the
adoption of B.L.S. by one of K.M.'s sisters, not the one living with the accused abuser. The parents
concede that the termination of parental rights to B.L.S. is not at issue. She will be discussed only
as she relates to the initial removal of and termination of rights to the other children.
2. Section 161.003 of the Texas Family Code has some distinct elements, including timing
elements, not found in the more commonly-used grounds of Section 161.001 of the Texas Family
Code. See Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2009).
3. The Department sought termination as to the children based on Sections 161.001(1)(D), (E),
(N), and (O). Those grounds, generally, involve dangerous conditions, dangerous conduct,
constructive abandonments, and failure to comply with a court order, respectively.
4. Before a final order was signed, the attorneys and trial court realized that trial in regard to
S.M.M. started before the Department had been his managing conservator for six months, although
it did begin 181 (trial court says 182) days after the Department had filed its original petition as to
S.M.M. (on April 1, 2008). Tex. Fam. Code Ann. § 161.003(a)(3), (c). In an attempt to cure the
error, on October 21, 2008, the trial court granted a new trial as to S.M.M., took judicial notice of
the testimony from the September 29-30 trial, then entered an order only as to S.M.M. and another
order as to the two older children. All parties appeared at that hearing and re-urged the evidence
presented three weeks earlier at the hearing. On the record, the trial judge stated she had found
earlier that J.M. had not paid child support as ordered. The trial court's ruling does not confirm that
statement.
5. Pursuant to the parents' motion to reform the order of termination and to combine the
separate orders as to S.M.M. and as to B.L.S. and A.L.M. for purposes of appeal, the trial court
reformed those two final orders into one final order November 20, 2008. 

 The trial court had earlier signed an order of consolidation November 7, 2008, to make clear
the two causes were combined. No written order consolidating the causes before trial appears in the
clerk's record, but the trial court makes reference in its written order to its June 11 oral declaration
that the two causes were to be consolidated. The docket sheet for the S.M.M. cause states it was
consolidated with the B.L.S. and A.L.M. cause, but no consolidation order was signed before trial. 
6. The Fort Worth court suggested that the evidence in In re J.P., No. 02-07-00026-CV, 2008
Tex. App. LEXIS 773 (Tex. App.--Fort Worth Feb. 4, 2008, no pet.) (mem. op.), would have been
insufficient. However, as the court noted, the Department did not allege Section 161.003 as grounds
for termination in that case.
7. Published portion found at In re C.M., 996 S.W.2d 269 (Tex. App.--Houston [1st Dist.]
1999, no pet.).
8. At the beginning of the Department's investigation, a worker visited the family home to find
no food and inadequate sleeping arrangements. The children were hungry, thirsty, and unkempt, and
one child had very bad tooth decay. Id. at 785.
9. Mason discontinued counseling services because she became concerned about S.M.M. still
being in the home at that time and requested that the family be directed to another counselor. Mason
wrote a letter about the safety of S.M.M. and her concerns about that. Her position was yet another
reason the Department sought removal of S.M.M. 
10. Winsted first detailed his observations following his evaluation of A.L.M., explaining that
A.L.M. may have emotional or behavioral problems as suggested by some gender identity confusion
and sexual acting out. He later conceded that A.L.M.'s elevated behavioral and emotional issues
could have been caused or exacerbated by removal from his parents. 
11. Winsted interjected that it was understandable, under the circumstances, for K.M. to have
trust issues. 
12. The Department seems to emphasize the parents' decision to live with Robertson and with
de la Rosa, characterizing them both as sexual predators. It is important to note that J.M. did not
grow up around his father and was told that he went to jail for DWI when, in fact, it appears that he
was incarcerated after being convicted of sexual abuse of a daughter. J.M. found this out during the
Department's investigation, and, after he learned of the sex offense conviction, the family did not live
with de la Rosa again. So, it appears the family did not know of de la Rosa's sexual abuse history. 
Moreover, there is no evidence that de la Rosa abused or attempted any abuse as to any of the
children at issue here. S.M.M. never lived with de la Rosa.
13. Winsted testified that his opinion was contingent on the parents' continued participation in
services. As described in a later footnote, the parents participated in the services offered. 
14. The other primary testimony was offered by McMillan, a caseworker whose testimony has
been previously summarized. McMillan testified about the service plan established with K.M. and
J.M. Generally, her testimony was that K.M. and J.M. complied with the plan. The testimony
showed that the parents attended required parenting classes and had a safe and appropriate home. 
However, McMillan volunteered that a suitable house was not relevant because "if they can't protect
their children, then there is no need to look at the house . . . in my opinion." Other parts of the plan
completed were furnishing a health and social history of the children, and attending counseling. In
May 2008, the Department transferred the counseling to Winsted, and K.M. and J.M. attended
sessions in June and August (this hearing was September 29, 2008). McMillan was critical because
they had not attended more counseling sessions. Counseling was changed to Winsted because the
previous counselor "did not want the liability" of leaving the infant S.M.M. with his parents. This
concern was one of the reasons S.M.M. was then removed. Drug usage was never a problem, as
verified by drug testing. After S.M.M. was removed in March 2008, the goal of the Department was
to see if the parents could demonstrate the ability to parent so the "children could be returned to
them." But McMillan said instead they showed a "complete lack of parenting skills." Examples of
this were the pineapple juice incident and having to redirect K.M. to hold a baby bottle correctly. 
Finally, she concluded they put themselves ahead of the children because they had cigarettes, but did
not buy the children kiddy meals and because of the dispute about watching Barney on television. 
Needless to say, none of this evidence approaches the high standard of proof required to terminate
the parental rights of the parents. 
15. The Texas Supreme Court held that the Department requested conservatorship based on
Section 153.131(a) of the Texas Family Code. The trial court specifically found that the
appointment of the parents would significantly impair the child's physical health or emotional
development as required by this section. 
16. In re A.S., 261 S.W.3d 76, 92 (Tex. App.--Houston [14th Dist.] 2008, pet. ref'd). In a case
where the Department used precisely the same language as found here for the grounds for
conservatorship ("pursuant to Sections 153.005 and 263.404") and also alleged Section 153.131
grounds (appointment of parent would significantly impair child's physical health or emotional
development), but the trial court failed to make such findings, the Houston Fourteenth Court found
the conservatorship order was based solely on the termination order and with its demise, the
conservatorship order necessarily was reversed. Here, the Department did not allege Section
153.131 as grounds for conservatorship, and the trial court found none. 



17. The Department has requested that if the evidence is found to be legally insufficient, this
Court modify the judgment to find termination on either Section 161.001(1)(D) or (E), relating to
endangering conditions and endangering conduct, respectively. We may not grant such relief. See
In re J.R.S., 232 S.W.3d 278, 285 (Tex. App.--Fort Worth 2007, no pet.); Vasquez v. Tex. Dep't of
Protective & Regulatory Servs., 190 S.W.3d 189, 194 (Tex. App.--Houston [1st Dist.] 2005, pet.
denied).