COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-280-CV

 

 

IN THE INTEREST OF M.B.,                                           

M.M.A.,
M.G.A., M.R.A., AND 

M.W.A. JR., CHILDREN                                                                        

 

                                                                                                        

                                              ------------

 

            FROM
THE 367TH DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

I. Introduction








Appellant M.A.M.B. appeals
the trial court=s order
terminating her parental rights to her children, M.B. (Beth), M.M.A. (Mona),
M.G.A. (Greg), M.R.A. (Rachel), and M.W.A. (Will).[2]  In eight points, appellant argues that the
evidence is legally and factually insufficient to support the endangerment,
noncompliance, or best interest findings. 
See Tex. Fam. Code Ann.
' 161.001(1)(D), (E), (O) & (2) (Vernon Supp. 2007).  We affirm.

II. Background Facts

Appellant grew up in New
York. In 1997, at the age of eighteen, she became pregnant with her daughter
Beth when J.J., the man she was living with, raped her.  In 1998, appellant met a visiting family friend,
M.A. (Andrew), and moved to Texas to be with him.  Appellant and Andrew lived with Andrew=s mother for six months before moving into the Lewisville Apartments. 

Appellant and Andrew had Mona
in 1999 and Greg in 2001.  In 2001, the
Texas Department of Family and Protective Services (TDFPS) received a referral
regarding the physical and dental neglect of the children; TDFPS referred the
case to Family Based Safety Services[3]
(FBSS), but appellant did not complete those services. 








Appellant and Andrew were
married in 2002, and they had Rachel in 2003. 
In June 2004, TDFPS received a referral alleging that appellant and
Andrew were abusing alcohol and not properly supervising the children.  TDFPS disposed of the case as ARuled Out with Risk Indicated@ and referred it to FBSS. However, before FBSS could become involved,
appellant, Andrew, and their children moved back to New York in July 2004.  While in New York, appellant met A.H.
(Harold) and moved in with him, taking the children.  Child Protective Services in New York became
involved after learning that Harold was a sex offender.  Upon learning that Harold was a sex offender,
appellant then moved back to Texas with Andrew while pregnant with Harold=s baby. 








When they returned to Texas,
appellant and Andrew moved in with Andrew=s nephew W.A. (Walter) and his wife J.A (Jill) for a few months.  In November 2004, TDFPS night response
investigator Jamie Parsons received two referrals alleging that appellant was
aggressive towards her children, that she was not seeing to their dental needs,
that she had previously lived with a sex offender in New York, and that she was
pregnant with the sex offender=s baby.  Parsons visited appellant
in Lake Dallas at Walter and Jill=s house.  After seeing the
children, Parsons became concerned about their teeth because the three older
childrenCBeth, Mona, and GregChad severe tooth decay.  Rachel
had also recently been bitten by a brown recluse spider.  Parsons enrolled appellant in Medicaid and
took the children to the dentist. 
Parsons tried to educate appellant on the proper foods to prevent tooth
decay because appellant tended to buy junk food for the children.  Appellant was also unemployed most of this
time.  Parsons could not substantiate the
allegations regarding physical abuse. 

Jill testified that she had
to ask appellant to leave their home because appellant would not keep herself
or the children clean, did not contribute or help out around the house, and did
not have a job.  Jill finally kicked
appellant out of the house after appellant left a dirty bandage on the kitchen
counter by the children=s food.  Jill allowed the children and Andrew to
remain, but appellant continued to come by the house.  Once, appellant threatened Jill, and Jill
called the police.  At that point, Andrew
moved out with the children to live with appellant. 








Appellant gave birth to Will
in early 2005.  Appellant and Andrew
moved to Arbor Creek Apartments in Lewisville for about eight months until they
were evicted because Andrew lost his job and appellant did not make enough
money at her job at IHOP to cover the rent. 
The family then moved to Budget Suites in Lewisville.[4]  Initially, the family stayed in a two-bedroom
suite, but they had to downsize to a one bedroom because of financial
difficulties. 








TDFPS worker Parsons
continued to work with appellant between November 2004 and March 2005 until she
referred appellant=s case to
FBSS.  Jennifer Chappell received the
case from FBSS in March 2005 and met with appellant on April 11.  TDFPS wanted appellant to complete parenting
classes, a psychological evaluation, individual counseling, and an early
childhood intervention (ECI) evaluation because Rachel did not appear to be
mentally Aon target,@ and she was not speaking at eighteen months.  After the initial visit, Chappell met with
appellant once a week and worked with her regarding appellant=s inability to meet her family=s financial or basic needs, her lack of parenting, and the
uncleanliness of the home.  For example,
appellant=s apartment
was dirty, filled with flies, and had an odor; appellant also had a puppy and
two rabbits that she did not clean up after. 
Dirty clothes, dirty dishes, and dog feces were scattered throughout the
apartment.  Chappell testified that
appellant would clean the apartment but then allow it to get dirty again. 

The children were usually
dirty and ran around unsupervised. 
Chappell testified that they looked like they had not been bathed and
that they had an odor; their faces were brown with dirt and the bottoms of
their feet would be black.  The clothes
the children wore were dirty and did not fit well.  Because the children did not have adequate
clothing, Chappell would take them clothes twice a month, but she never saw
them wear the donated clothes.  Chappell
also helped appellant get food stamps so that appellant could provide more
nourishing meals.  The children also had
lice four times in four months, which appellant would treat.

Although appellant completed
parenting and homemaking services, she refused to complete a psychological
evaluation and counseling.  Appellant set
up the ECI evaluation but was not at home for the appointment.  Appellant and Andrew were never able to pay
their rent, and neither appellant nor Andrew worked consistently. 








Although TDFPS received
another referral in May 2005 regarding neglectful supervision, Chappell closed
appellant=s case in
July 2005 because appellant had participated in some services and had made
progress.  The basic needs of the
children, such as a place to sleep, food, clothing, and medical care, were met,
so TDFPS did not remove the children from appellant=s care. But TDFPS received yet another referral in August 2005, which
was also referred to FBSS. 

At Thanksgiving 2005, Glenda
Revert, who was a driver for Durham Transportation, became acquainted with
appellant and the children because they were on her bus route.  Revert asked Beth and Mona to spend the night
with her and offered to help appellant with her laundry.  She testified that when she went to get
appellant=s laundry,
she noticed that their room at the Best Value Inn where they were staying was
not well-kept and smelled like urine or a locker room.  She took appellant=s laundry and gave the girls a bath because they had lice.








In December 2005, TDFPS
received another referral that the children were being neglectfully supervised
and that they were sexually acting out. Former TDFPS investigator Kelly
Backhaus interviewed Beth and Mona at school. 
Beth told Backhaus that they were occasionally left alone when appellant
went to the hotel office and that Andrew used drugs, but appellant and Andrew
were separated.  Mona, however, said that
they were not left home alone and that their parents had used drugs in the
past.  Backhaus then called appellant and
met with her the next day.  Backhaus
observed that the home had an odor and the children were slightly unkept.  Appellant told Backhaus that she did not use
drugs, but Andrew had used drugs in the past. Appellant also told her that
Andrew was paying the rent even though he was not living there.[5]


Backhaus next requested a
risk staffing, which occurs when a family has a history with TDFPS or the
potential for great risk and several supervisors review a family=s history and assess what, if anything, should be done.  The risk staffing took place on the morning
of January 17, 2006, and TDFPS determined that more information was needed
before proceeding to remove the children. 
Coincidentally, that afternoon, Backhaus received another referral
regarding a large untreated burn on Will=s left hand.  After the
referral, TDFPS took immediate action. 
Backhaus went to talk to Beth and Mona again about Will=s burn, and the girls gave different stories about what had
happened.  On January 18, 2006, Backhaus
spoke with Andrew on the phone.  Andrew
told Backhaus that he noticed the burn on Will=s hand when he visited, but he could not get any more information from
appellant.  Andrew also stressed to Backhaus
that appellant needed help. 








When Backhaus arrived at
appellant=s home at
Budget Suites, she observed that food was lying around, that the heater was
broken, that the babies were in soiled diapers, that there were no sheets or
pillows on the bed, and that there was an odor. 
Additionally, the children were dirty. 
For example, Rachel had marker and mascara on her face, and Greg had
black teeth.  Will=s hand was wrapped, and appellant said that the babysitter had thrown
a cigarette on the ground while it was still lit, and Will had grabbed it.  Appellant also told Backhaus that she had
taken Will to the hospital and that he was allergic to the tape they used,
which explained the other sores on his hand.

Backhaus removed the children
and took them to the TDFPS office to conduct a more thorough body check, which
revealed that the two youngest children had diaper rashes.  The children also had lice.  Backhaus took Will and Rachel to a medical
center where they were treated for influenza and ear infections, and Will was
treated for his burn. 

TDFPS placed the children
with foster parent Kathy in January 2006. Kathy testified that the children had
behavioral problems.  For example, they
were disorderly, disrespectful, and defiant. 
The children did not know how to appropriately express their feelings;
for example, Mona would tear up her bedspread and wall paper when she did not
get her way.  The children also sexually
acted out. 








Around the time the children
were removed, appellant worked as a bus aid for the Lewisville Independent
School District and as a waitress at IHOP. After TDFPS removed the children,
appellant continued to live at Budget Suites, but shortly thereafter in July
2006, she and her boyfriend Kevin got a mobile home together in Lake Dallas.  Kevin became physically aggressive, and she
stopped seeing him in October or November 2006. 
Although appellant worked at IHOP between August and November 2006, she
could not afford the mobile home after Kevin moved out, so she moved in with a
friend, Dee, in Lewisville in December 2006. 
Dee testified that appellant helped her around the house and was
clean.  However, she stated that
appellant moved out because of her lack of employment and transportation;
appellant also placed a financial strain on Dee.  Appellant then moved to Kansas and lived with
her mother for a month before moving to an apartment in February 2007.  Appellant also worked at a Waffle House in
January 2007.








CASA assigned volunteer Janet
Aune to appellant=s case in
January 2006.  Aune attended all the
visitations except one.  At visits,
appellant told the children that they were going home with her, made negative
comments and accusations about the foster home, and burdened the children by
making them feel sorry for her.  Aune
testified that there was a lack of bonding between appellant and the children
and that there were no signs of attachment. 
Laura Greuner, the children=s therapist, also testified that they did not have a strong attachment
to appellant.  After visitations, the
children exhibited destructive behavior and acted out.  For example, Greg used scissors to cut his
hair, body, and clothes.  In October
2006, Beth, Mona, and Greg told Aune that they did not want to attend visits
any longer.  In February 2007, TDFPS
discontinued visitation. 

After a jury trial held May
21 through May 24, 2007, the trial judge, in accordance with the jury verdict,
held that appellant (1) knowingly placed or knowingly allowed Will to remain in
conditions or surroundings which endangered his physical or emotional well
being, (2) engaged in conduct or knowingly placed all of her children with
persons who engaged in conduct which endangered their physical or emotional
well-being, (3) failed to comply with the provisions of the service plan, and
that (4) termination was in all of the children=s best interest.[6]  See Tex.
Fam. Code Ann. '' 161.001(1)(D),
(E), (O), (2).  Appellant timely filed
this appeal. 

III. Standard of Review








A parent=s rights to Athe
companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@  Santosky v. Kramer, 455
U.S. 745, 758B59, 102 S.
Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  While parental rights are of constitutional
magnitude, they are not absolute.  Just
as it is imperative for courts to recognize the constitutional underpinnings of
the parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the State
seeks not just to limit parental rights but to end them permanentlyCto divest the parent and child of all legal rights, privileges,
duties, and powers normally existing between them, except for the child=s right to inherit.  TEX. FAM. CODE ANN. ' 161.206(b) (Vernon Supp. 2007); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  We strictly
scrutinize termination proceedings and strictly construe involuntary
termination statutes in favor of the parent. 
Holick, 685 S.W.2d at 20B21; In re E.M.N., 221 S.W.3d 815, 820 (Tex. App.CFort Worth 2007, no pet.).








In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish one ground listed under subdivision (1) of
the statute and must also prove that termination is in the best interest of the
child.  TEX. FAM. CODE ANN. ' 161.001;
In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).

Termination of parental
rights is a drastic remedy and is of such weight and gravity that due process
requires the petitioner to justify termination by clear and convincing
evidence.  TEX. FAM. CODE ANN. '' 161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002).  This intermediate standard
falls between the preponderance standard of ordinary civil proceedings and the
reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); In re C.S., 208 S.W.3d 77, 83 (Tex. App.CFort Worth 2006, pet. denied). 
It is defined as the Ameasure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.@  Tex.
Fam. Code Ann. ' 101.007
(Vernon 2002).

A.     Legal
Sufficiency








In reviewing the evidence for
legal sufficiency in parental termination cases, we must determine whether the
evidence is such that a fact-finder could reasonably form a firm belief or
conviction that the grounds for termination were proven.  In re J.P.B., 180 S.W.3d 570, 573
(Tex. 2005).  We must review all the
evidence in the light most favorable to the finding and judgment.  Id. 
This means that we must assume that the fact-finder resolved any disputed
facts in favor of its finding if a reasonable fact-finder could have done
so.  Id.  We must also disregard all evidence that a
reasonable fact-finder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable fact-finder could and disregard contrary evidence unless a
reasonable fact-finder could not.  Id.

We must therefore consider
all of the evidence, not just that which favors the verdict.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
fact-finder=s
province.  Id. at 573B74.  And even when credibility
issues appear in the appellate record, we must defer to the fact-finder=s determinations as long as they are not unreasonable.  Id. at 573.

B.     Factual
Sufficiency








In reviewing the evidence for
factual sufficiency, we must give due deference to the fact-finder=s findings and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a fact-finder could reasonably form a firm conviction or
belief that the termination of the parent=s parental rights would be in the best interest of the child.  C.H., 89 S.W.3d at 28.  If, in light of the entire record, the
disputed evidence that a reasonable fact-finder could not have credited in
favor of the finding is so significant that a fact-finder could not reasonably
have formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  H.R.M.,
209 S.W.3d at 108.  If we reverse on
factual sufficiency grounds, then we must detail in our opinion why we have
concluded that a reasonable fact-finder could not have credited disputed
evidence in favor of its finding.  J.F.C.,
96 S.W.3d at 266B67.

IV. Endangerment Findings

In her third and fourth
points, appellant argues that the evidence is legally and factually
insufficient to support the jury=s findings that she engaged in conduct or knowingly placed her
children with persons who engaged in conduct which endangered their physical or
emotional well-being.  Tex. Fam. Code Ann. ' 161.001(1)(E).








Under subsection
161.001(1)(E) of the Texas Family Code, the term Aendanger@ means to
expose to loss or injury, to jeopardize.  Id.; Boyd, 727 S.W.2d at 533.  Accordingly, when analyzing the trial court=s findings under subsection (E), we must determine whether sufficient
evidence exists that the endangerment of the child=s physical well-being was the direct result of the parent's conduct,
including acts, omissions, or failures to act. 
In re D.M., 58 S.W.3d 801, 811 (Tex. App.CFort Worth 2001, no pet.). 
Termination under subsection 161.001(1)(E) must be based on more than a
single act or omission; a voluntary, deliberate, and conscious course of
conduct by the parent is required.  See
Tex. Fam. Code Ann. ' 161.001(1)(E); D.M., 58 S.W.3d at 812 (explaining that under
subsection (E) a court may order termination of parental rights if that parent
has engaged in conduct or knowingly placed the child with persons Aengaging in conduct which endangers the emotional or physical
well-being of the child@); In re
D.T., 34 S.W.3d 625, 634 (Tex. App.CFort Worth 2000, pet. denied); In re K.M.M., 993 S.W.2d 225,
227B28 (Tex. App.CEastland
1999, no pet.).  However, it is not
necessary that the parent=s conduct be
directed at the child or that the child actually suffer injury.  Boyd, 727 S.W.2d at 533.  The specific danger to the child=s well-being may be inferred from parental misconduct standing
alone.  Id.

To determine whether
termination is necessary, courts may look to parental conduct both before and
after the child=s
birth.  D.M., 58 S.W.3d at
812.  As a general rule, conduct that
subjects a child to a life of uncertainty and instability endangers the
physical and emotional well-being of a child. 
In re S.D., 980 S.W.2d 758, 763 (Tex. App.CSan Antonio 1998, pet. denied).

A.     Health
and Living Conditions

Here, the evidence indicates
that appellant had difficulty maintaining a clean and stable environment for
her children.  Additionally, she did not
ensure that her children=s basic
hygiene needs were met. 








Andrew testified that TDFPS
removed the children from appellant=s care because the apartment was not clean, and the children
themselves were not clean.  He also
stated that the children often looked dirty and that they had lice on and off
for a couple of years.  Andrew testified
that the children were never homeless and always had food, although sometimes
not an abundance of food. He stated that appellant would bathe the children and
put their school clothes on at night before they went to sleep. 

Revert, who once went into
appellant=s apartment
to help her with the laundry, testified that the apartment was not well-kept
and that it smelled like urine or a locker room.  She observed that the kitchen was dirty and filled
with old wrappers, and food was sitting out. 
Caseworker Chappell also stated that appellant=s home was dirty and had an odor. 
Kelly Duncan, a friend from church, also visited appellant=s home, looked in the window, and noticed its uncleanliness.

Beth also told Greuner and
Kathy that there were bugs all over the house and in their food, although
sometimes Beth told Greuner that nothing was wrong with their home.  Mona was embarrassed to have people over
because of the condition of their house. 
TDFPS worked with appellant regarding the cleanliness of her home, and
although appellant would clean the apartment, she was unable to maintain it. 








The evidence also demonstrates
that appellant neglected the children=s dental and personal hygiene. 
Jill testified that she had to ask appellant to leave her home after
appellant refused to keep herself or her children clean.

Chappell testified that the
children did not have adequate clothing, and the clothing that the children did
wear was dirty and did not fit well.  In
the winter, the children did not have coats. 
Chappell provided clothing for the children, but she never saw them wear
any of the clothes.  Appellant told her
that the clothes were stolen. 
Additionally, the children were usually dirty, had an odor, and ran
around unsupervised.  Chappell also
testified that the children did not have nourishing meals.

Revert stated that Beth and
Mona spent the night with her and that both girls had a bad infestation of
lice.  Additionally, the girls= teeth looked like they were not properly taken care of although they
did not appear rotten or decayed. Duncan testified that the children were
usually not clean and had dirty fingernails. 
Three-year-old Rachel frequently had makeup on her face. 








Appellant=s friends and coworkers, however, testified that her apartment and
children were clean.  Dee, who allowed
appellant to live with her from December 2006 to February 2007, testified that
appellant was clean and helped around the house.  Pamela Rasmussen and Lisa Hektor, who lived
at the same apartment complex and worked with appellant, also testified that
appellant=s home and
children were clean.

The record demonstrates that
appellant struggled with maintaining a clean and healthy environment for
herself and her children.  Additionally,
appellant had difficulty keeping her children appropriately clean and clothed
because they were regularly dirty and had lice. 
Although there is also evidence to the contrary, the jury as fact-finder
was free to assess the credibility of all the witnesses and determine that the
children=s living conditions were inadequate. 
See J.P.B., 180 S.W.3d at 573. 

B.     Service
Plan








The evidence also indicates
that appellant did not successfully participate in her service plan.[7]  Backhaus testified that TDFPS initiated FBSS
with appellant three times, but appellant did not participate until the third
attempt. Appellant=s service
plan required her to complete parenting classes, a psychological evaluation,
and recommendations from the evaluation, which included individual counseling
and an ECI evaluation.  TDFPS also
addressed issues such as meeting the family=s financial needs, parenting skills, and cleanliness.  Appellant completed parenting and homemaking
services.  She also participated in a
psychological evaluation, but she did not complete it.  Appellant did not participate in an ECI
evaluation.  She also attended
counseling, but she was not successfully discharged.

Therapist Michelle Greer, who
began seeing appellant in February 2006 as part of her service plan for
individual counseling, testified that she initially thought appellant was
making progress, but then discovered appellant was not reporting things
accurately to her.  Greer unsuccessfully
discharged appellant from counseling because appellant was not being honest
with her.  For example, appellant told
Greer that she was working when she was unemployed; she also told Greer that
she was not seeing Andrew, but Greer saw Andrew waiting for appellant after a
session.  Greer stated that appellant was
involved with a lot of instability and lacked a support system.








CASA volunteer Aune also testified
that appellant did not comply with her service plan.  Aune did not know if appellant attended
domestic violence or anger management classes. 
Aune testified that appellant did complete parenting classes, but she
did not secure stable housing for more than the required six months.  Aune also stated that appellant did not have
a steady income because of her volatile work history.  Caseworker Daphne Schwartz testified that TDFPS
did not believe appellant had complied with her service plan and it was in the
children=s best interests for appellant=s parental rights to be terminated. 

1.     Employment and Residences

Additionally, appellant did not maintain a steady job or stable housing
for at least six months, which was required by her service plan.  The evidence shows that appellant worked as a
bus assistant for Durham School Services from the fall of 2005 to the spring of
2006.  Appellant=s supervisor, Deborah Wortham, testified that although appellant had a
job with them, she would disappear.  For
example, in the fall of 2006, Deborah attempted to contact appellant regarding
the new school year, but she did not receive a response. Appellant finally
contacted Deborah=s
supervisor, but she still did not return to work, and Deborah testified that
appellant Aleft our
employment again.@ Appellant
came back to work in January 2007 and worked for several weeks until she did
not show up one day.  Appellant then came
to the office with crutches and explained that she had a foot injury. Deborah
testified that they held her job for thirty days but that appellant did not
contact them again so she was terminated for job abandonment.  Appellant also worked at IHOP from August
through November 2006, but she quit showing up for work.  At one point, appellant worked for a daycare
where her children attended.








Aune testified that she had concerns regarding appellant=s work history because of appellant=s pattern of abandoning her jobs. 
Aune also testified that appellant=s bad work history prevented her from maintaining a steady income to
provide for her children.

The record shows that appellant also had numerous residences.  In the seventeen months that TDFPS had the
children after removal, appellant lived in six places, including a motel, a
mobile home, with a friend, and in several apartments.  Appellant also had a history of being unable
to pay her rent.  Appellant admitted that
she understood that part of her service plan was to maintain a steady place of
residency for six months but that she was not able to do that because TDFPS
told her to move.

2.     Visitation 








The evidence reflects that
appellant attended visitations regularly, but after the children saw appellant,
they would exhibit destructive behavior. 
For example, Greg cut himself with scissors.  When Greg=s teacher removed Greg=s scissors, he stole other students= scissors and continued to harm himself.  When all of the scissors were removed, Greg
resorted to stealing other items in the classroom or physically attacked his
classmates.  Further, appellant acted
inappropriately at visits.  For example,
she laughed if one of the children made fun of another, encouraged the children
to make fun of Andrew, and tried to get sympathy from the children by using
physical problems.  Appellant also spoke
negatively of the foster family to the children.  In October 2006, the children decided that
they did not want to attend visitations with appellant.  However, appellant testified that the
children did not stop attending visits because of her but because they did not
want to see Andrew.

The evidence indicates that
appellant did not sufficiently work her service plan and that she was unable to
maintain adequate housing or employment. Furthermore, despite attending
visitations, appellant=s
interactions with her children negatively impacted their behavior to the extent
that visits were stopped.








Based on our review of the
entire record, we conclude that a factfinder could reasonably form a firm belief
or conviction that appellant engaged in conduct or knowingly placed her
children with persons who engaged in conduct which endangered their physical
and emotional well-being.  Therefore, we
hold that the evidence is legally and factually sufficient to support the trial
court=s findings under subsection 161.001(1)(E).[8]  Tex.
Fam. Code Ann. ' 161.001(1)(E);
see In re S.B., 207 S.W.3d 877, 885 (Tex. App.CFort Worth 2006, no pet.).  We
overrule appellant=s third and
fourth points.

V. Failure to Comply with
Court Order

In appellant=s fifth and sixth points, she claims that the evidence was legally and
factually insufficient to terminate her parental rights for failure to comply
with the provisions of a court order necessary to obtain the return of her
children.  See Tex. Fam. Code Ann. ' 161.001(1)(O).

Only one finding under
section 161.001(1) is necessary to support a judgment of termination.  Id. ' 161.001(1); In re K.A.S., 131 S.W.3d 215, 225 (Tex. App.CFort Worth 2004, pet. denied); D.M., 58 S.W.2d at 813.  Because we conclude that there is both
legally and factually sufficient evidence to support the jury=s findings under family code subsection 161.001(1)(E), we need not
address appellant=s remaining
points with respect to the jury=s finding under subsection 161.001(1)(O).  See Tex.
Fam. Code Ann. ' 161.001(1)(D),
(E), (O); see also Tex. R. App.
P. 47.1; K.A.S., 131 S.W.3d at 225.

VI. Best Interest Findings

In appellant=s seventh and eighth points, she argues that the evidence was legally
and factually insufficient to support the jury=s finding that termination of her parental rights was in the children=s best interest.  See Tex. Fam. Code Ann. ' 161.001(2).








A.     Applicable Law

Prompt and permanent
placement of the child in a safe environment is presumed to be in the child=s best interest.  Tex. Fam. Code Ann. ' 263.307(a) (Vernon 2002). 
There is also a strong presumption that keeping a child with a parent is
in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include:

(1)    the desires of the child;

 

(2)    the emotional and physical needs of the child now and               in the future;

 

(3)    the emotional and physical danger to the child now and in the
future;

 

(4)    the parental abilities of the individuals seeking custody; 

 

(5)    the programs available to assist these individuals to promote the
best interest of the child;

 

(6)    the plans for the child by these individuals or by the agency
seeking custody;

 

(7)    the stability of the home or proposed placement;

 

(8)    the acts or omissions of the parent which may indicate that the
existing parent-child relationship is not a proper one; and

 

(9)    any excuse for the acts or
omissions of the parent.

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976). 








These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when
appropriate.  C.H., 89 S.W.3d at
27.  Furthermore, undisputed evidence of
just one factor may be sufficient in a particular case to support a finding
that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

B.     Analysis

1.     Desires
of the children

At the time
of trial, Beth was nine years old, Mona was eight years old, Greg was five
years old, Rachel was three years old, and Will was two years old.  The children=s therapist, Greuner, testified that when she initially began seeing
the children in the summer of 2006, they wanted to go home with appellant, but
over time, they wanted to stay in their foster home.  In fact, by October 2006, the children
decided that they wanted to discontinue their visits with appellant.

The evidence also shows that the three
older children did not have a strong attachment to appellant and that they were
excited about the possibility of living with relatives.  Beth wanted to be adopted by her foster family,
and Mona wanted to live with her aunt Jill. 








2.     The emotional and physical needs and danger
of the children now and in the future

 

When TDFPS
removed the children, Will had a severe burn on his hand, and appellant was not
exactly sure what had happened. 
Appellant told Backhaus that she had taken Will to the hospital, but she
had not given him any medicine. 
Appellant also said that the additional sores Backhaus noticed on the
baby=s hand were caused by an allergic reaction to the tape used.  Additionally, Will and Rachel had diaper
rashes, influenza, and ear infections, and all of the children had lice.  Will also had pink eye.  The record is also replete with evidence that
the children had problems with their teeth and that their teeth looked
black.  However, foster parent Kathy
testified that their teeth look dark because they had silver caps on them.  Appellant testified that she kept the
children=s immunizations up-to-date and that she provided TDFPS with the
children=s medical records after they were removed. 

        The
evidence also demonstrates that the children suffered from behavioral
problems.  Kathy testified that when the
children first arrived in her home, they were disorderly, aggressive,
disrespectful, sassy, and out of control. 
She stated that they did not know how to appropriately express their
feelings and would yell, hit, push, shove, and scream. 













Greuner
testified that the children had a lot of issues such as anger, sexually acting
out, and difficulty following rules. 
Beth and Mona had similar issues with not telling the truth, with
sexually acting act, with being defiant, with not listening to their foster mother,
and with not obeying rules.  Greuner
stated that Mona had additional issues because she had more unresolved anger
and did not show remorse for her actions. 
Although younger than Beth, Mona was the bully and made fun of her
siblings and manipulated them.  Greuner
testified that Mona=s behavior
had changed very little despite therapy. 
She also testified that all of the older children were physically
aggressive.  For example, the Boys and
Girls Club suspended Mona for choking another girl, and Greg had kicked a girl
in the stomach.  Greg also cut himself,
and he told Greuner that he did it because the other kids at schools did not
like him, he hated himself, and he wanted to kill himself.  Greuner also testified that in play therapy,
Greg acted out against female toys, which was consistent with a family violence
environment.  Rachel was bossy, climbed
the furniture, and threw temper tantrums; Will was also aggressive and kicked
his playmates at daycare.  Kathy testified
that Beth, Mona, and Greg had all been in trouble for stealing.  Greuner testified that the children=s behavior had vacillated since their removal.  She stated that Greg had made consistent
improvements, that Beth=s progress
had gone up and down, and that Mona had not made any consistent improvements or
progress.

Greuner also
testified that all of the children said sexual things and acted
inappropriately.  Revert, with whom the girls
spent the night with one time, testified that they knew too much about sexual
behavior.  For example, Beth touched
herself, and Mona danced provocatively. 
The children also got on top of each other and tried to engage in other
sexual behaviors.  Kathy testified that
the girls showed off their chest, and Greg Amooned@ the
girls.  The children also told Greuner
that they had seen and heard their parents have sex.  Greuner testified that she believed the
children were exposed to sexual things but that nothing had been done directly
to them.  

The children
also witnessed domestic violence.  For
example, they were present when their parents fought, and they saw Andrew hit
appellant.  The children were also
present when appellant had an altercation with her mother in New Mexico, and
Greg was accidentally struck by a phone. 
Additionally, Greg=s actions in
play therapy were consistent with a child who had been exposed to family
violence.  Appellant also told Beth she
was conceived because appellant was raped although appellant denied sharing
this with Beth. Mona also knew of the incident, and she would make fun of Beth
because of it.  TDFPS could not
substantiate any physical abuse. 








Appellant
testified that the children did not have any behavioral problems before they
were removed.  Other witnesses also
testified that the children had never had behavioral problems.  For example, Andrew testified that the
children did not exhibit any anger problems or behavioral issues until they
were placed in foster care, although he also testified that children were still
better off because they were in a more stable environment.  Revert testified that the children were good,
quiet, and well-behaved kids although Mona had an attitude.  However, Greuner testified that the children=s behaviors had been ingrained in them long before they were removed. 

3.     The parental abilities of the individuals
seeking custody, and the programs available to assist these
individuals to promote the best interest of the children

 

As noted
above, the evidence demonstrates that appellant did not sufficiently work her
service plan.  As previously discussed,
although appellant completed parenting and homemaking classes, she did not
successfully complete a psychological evaluation or counseling.  CASA volunteer Aune did not know whether
appellant had attended domestic violence or anger management classes.  Appellant did not maintain stable housing for
six months or consistent employment.








Additionally, the record shows that
although appellant attended her visitations with the children, she did not act
appropriately with them, and the children exhibited destructive behavior after
seeing appellant.  The record also shows
that there was a lack of bonding between appellant and her children, although
appellant would sit on the floor and play with the children or read to
them.  Appellant also encouraged
inappropriate behavior by laughing and making fun of the children or of their
father and by berating the foster family. TDFPS discontinued visits at the
children=s request. 

The record also reflects that appellant
did not appropriately see to the children=s medical or nutritional needs. 
For example, church acquaintance Duncan testified that she noticed Will=s burn and that appellant had tape applied directly to the wound.  Duncan also observed that appellant had a
bottle of medicine, which had the name scratched off and was outdated by two years.
The children also repeatedly had lice and dental problems.  Additionally, appellant had no regard for the
children=s proper nutrition.  At visits,
she did not bring healthy snacks or cut up the food for the younger children.








Furthermore, the record shows that
appellant had a history of unhealthy relationships and domestic violence.  Appellant had lived with a sex offender and
had maintained contact with men whom she had had volatile and sometimes violent
relationships.  For example, Duncan
testified that appellant called her to come over and talk to Andrew because he
had tried to strangle her.  The record
reflects that domestic violence occurred frequently in front of the
children.  Appellant also dated a man
named Kevin who was physically abusive. 
Moreover, Beth told Greuner that Andrew had done drugs and that Rachel
found drugs under the bed in what looked like a light bulb.

4.     The plans for the children by these
individuals or by the agency seeking custody, and the stability of the home or
proposed placement

 

Regarding
future plans for the children, TDFPS=s plan was for the children to be adopted by relative placement.  TDFPS caseworker Daphne Schwartz testified
that TDFPS originally wanted to place all of the children with their aunt Jill;
however, Jill had four children of her own and five more would be too
many.  Schwartz also testified that it
would be overwhelming for only one family member to take all five
children.  Additionally, the record
reflects that Beth and Mona did not get along and fought constantly.  At the time of trial, TDFPS planned for Mona
and Rachel to live with Jill because they had good rapport and interaction with
her and for Beth, Greg, and Will to live with other cousins. 








Appellant
also testified regarding her future plans if the children were returned to
her.  She stated that she had saved
$1200.00 to get a two or three bedroom apartment, picked a day care, and worked
out her work schedule with her boss so that she could take care of her
children.  Additionally, appellant had
applied for Section 8 housing and assisted day care.  She was also in the process of getting a car
and worked at a Waffle House. 

5.     The acts or omissions of the parent which
may indicate that the existing parent-child relationship is not a proper one,
and any excuse for the acts or omissions of appellant

 

As for the
parent-child relationship, there is evidence that appellant was affectionate
and loving with her children, but there was not a strong bond or
attachment.  Although the record contains
conflicting evidence regarding appellant=s parenting skills, the jury assessed the credibility of the
witnesses, and we defer to its determination. 
See J.P.B., 180 S.W.3d at 573.

In sum, the record demonstrates that
TDFPS had received between eight and ten referrals about appellant.  Appellant=s long history of neglecting her children; difficulty maintaining
stable housing or providing for the basic needs of her children; lack of
structure in the home environment, which included unclean living conditions and
poor hygiene; inconsistent employment history with no guaranteed income; and
inappropriate choices that put her children in danger, such as living with a
sex offender and engaging in domestic violence, all demonstrate that it was in
the children=s best
interest that appellant=s parental
rights be terminated.  See Tex. Fam. Code Ann. ' 161.001(2). 








Viewing all the evidence in the light
most favorable to the judgment, we hold that the evidence is legally sufficient
to support the jury=s finding
that termination of appellant=s parental rights was in the children=s best interest.  See id.  Viewing the same evidence in a neutral light,
we hold that it is also factually sufficient to support the jury=s findings that termination of appellant=s parental rights was in the children=s best interest.  See id.  We overrule appellant=s seventh and eighth points.

VII.
Conclusion

Having
overruled all of appellant=s dispositive points, we affirm the trial court=s judgment terminating appellant=s parental rights to Beth, Mona, Greg, Rachel, and Will.

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL F:    LIVINGSTON, HOLMAN,
and GARDNER, JJ.

 

DELIVERED:
July 31, 2008

 











[1]See Tex. R. App. P. 47.4.





[2]The
names of minors and parents have been redacted and replaced with fictitious
names in accordance with proposed Tex.
R. App. P. 9.8, 71 Tex. B.J. 287B88
(Tex. 2008, scheduled to take effect Sept. 1, 2008) (authorizing appellate
courts to redact the names of minor children and parents in appellate
proceedings following parental-rights termination proceedings or juvenile court
proceedings and replace them with fictitious names).





[3]Family
Based Safety Services is a program in which a TDFPS worker helps a family
become self-sufficient by working with the parents on a weekly or biweekly
basis and by offering help with services and errands such as appointments and
counseling. 





[4]At
some point, appellant, Andrew, and the children moved to New Mexico and briefly
lived with appellant=s
mother, but they stayed only for about two months because appellant and her
mother had a physical argument.  During
the argument, appellant=s
mother threw a phone at appellant, missed, and the phone hit Greg.  Appellant retaliated by kicking the screen
door which resulted in a piece of metal stabbing appellant=s
mother.  Police arrested appellant, and
the family returned to Texas.





[5]The
record indicates that Andrew did not continuously live with appellant and the
children, but he did contribute to the household and visit the children.





[6]The
trial court also terminated J.J.=s parental rights to his
daughter Beth; Andrew=s
parental rights to Mona, Greg, and Rachel; and Harold=s
parental rights to his son Will.  None of
them have appealed the trial court=s order. 





[7]Although
failure to comply with a service plan is an independent ground for termination,
the same evidence is also relevant to the analysis of sufficiency under
subsection 161.001(1)(E).  Tex. Fam. Code Ann. ' 161.001(1)(E).





[8]Because
we conclude that there is both legally and factually sufficient evidence to
support the jury=s
findings under family code section 161.001(1)(E), we need not address appellant=s
first and second points with respect to the jury=s
finding regarding Will under section 161.001(1)(D).  See  Tex.
Fam. Code Ann. ' 161.001(1)(D),
(E); see Tex. R. App. P.
47.1; In re K.A.S., 131 S.W.3d 215, 225 (Tex. App.CFort
Worth 2004, pet. denied).