

**IN THE**
**TENTH COURT OF APPEALS**

_____

**No. 10-21-00167-CV**

**IN THE MATTER OF THE MARRIAGE OF**
**JAMES VAUGHN IV AND AMBER VAUGHN**

_____

**From the 369th District Court**
**Leon County, Texas**
**Trial Court No. CV20-0222**

---

## MEMORANDUM OPINION

---

In six issues, James Vaughn IV (James), acting *pro se*, appeals from the final decree of divorce that dissolved his marriage with Amber Vaughn (Amber) following a bench trial.[1]

### Issue One

In his first issue, James contends that the trial court lacked jurisdiction of this matter because Amber had not been a resident of Leon County for the ninety days before the suit was filed.

---

[1] Because the parties share the same surname, we will refer to them by their first names for clarity.

AUTHORITY

Section 6.301 of the Family Code provides:

A suit for divorce may not be maintained in this state unless at the time the suit is filed either the petitioner or the respondent has been:

(1) a domiciliary of this state for the preceding six-month period; and

(2) a resident of the county in which the suit is filed for the preceding 90-day period.

TEX. FAM. CODE ANN. § 6.301. "Although section 6.301 is not itself jurisdictional, it is akin to a jurisdictional provision because it controls a party's right to maintain a suit for divorce and is a mandatory requirement that cannot be waived." *In re Green*, 385 S.W.3d 665, 669 (Tex. App.—San Antonio 2012, orig. proceeding); *accord Stallworth v. Stallworth*, 201 S.W.3d 338, 345 (Tex. App.--Dallas 2006, no pet.); *Reynolds v. Reynolds*, 86 S.W.3d 272, 276 (Tex. App.—Austin 2002, no pet.).

The question of residency is a fact issue for the trial court to determine, and a trial court's finding regarding residency will not be disturbed unless there is a clear abuse of discretion. *Green*, 385 S.W.3d at 669; *Stallworth*, 201 S.W.3d at 345. Admissions in petitions for divorce stating that the residency requirements of divorce are satisfied "are considered judicial admissions in the case in which the pleadings are filed, and no additional proof is required of the admitted fact." *Barnard v. Barnard*, 133 S.W.3d 782, 785 (Tex. App.—Fort Worth 2004, pet. denied); *see Hous. First Am. Sav. v. Musick*, 650 S.W.2d 764, 767 (Tex. 1983) ("Assertions of fact, not pled in the alternative, in the live pleadings of a party are regarded as formal judicial admissions. Any fact admitted is conclusively established in the case without the introduction of the pleadings or presentation of other

evidence."). Additionally, "[t]here are no limits on the number of residences that a party may maintain at any one time." *Stallworth*, 201 S.W.3d at 345 (citing *McAlister v. McAlister*, 75 S.W.3d 481, 485 (Tex. App.—San Antonio 2002, pet. denied)).

DISCUSSION

Here, Amber filed her original petition for divorce in Leon County on July 13, 2020. She stated in the petition that she had been "a resident of this county for the preceding ninety-day period." James then filed a counterpetition for divorce on August 26, 2020, in which he stated: "This suit is properly maintained in this county because . . . [Amber] has been a resident of this county for the past ninety (90) days." Both James and Amber therefore admitted the necessary residency requirements in their pleadings. *See Barnard*, 133 S.W.3d at 785. Furthermore, during the final hearing, Amber reaffirmed that she was a resident of Leon County for the ninety-day period preceding the filing of her petition for divorce.

James argues in his brief that the children attended school in Freestone County. James also testified as follows during the final hearing:

> Q.     And was [Amber] a resident of Leon County for at least 90 days before she filed for a divorce?
>
> A.     As far as I - - I guess she lived in Leon County, we did, but she didn't use that address. She used the Freestone County address. Still does, I believe.
>
> Q.     It's possible that she was a resident, and she's in fact testified she was. Would you agree with that, then?
>
> A.     Yes.

But even if James's testimony is some evidence that Amber maintained a residence in Freestone County, nothing prevents her from maintaining a residence in both Freestone and Leon counties at the same time. *See Stallworth*, 201 S.W.3d at 345.

Accordingly, the trial court did not abuse its discretion in determining that at the time of the filing of the suit, Amber had been a resident of Leon County for ninety days. James's first issue is overruled.

**Issue Two**

In his second issue, James contends that the trial court disregarded its own local rules at certain times during this case.

James first complains that the local rules required that a standing temporary restraining order be served on him with the initial service in this case but that the standing temporary restraining order was not included in the initial service of process. *See generally* LEON CNTY. (TEX.) DIST. CT. LOC. R. 4.7(B) ("The clerk of this court shall attach, to each citation to be served, a copy of the Standing Temporary Restraining Order."). James also argues in this issue that the trial court "gave unfair advantage and consideration" in this case by granting Amber a separate, "unwarranted" temporary restraining order.

Temporary restraining orders are not appealable. *In re Off. of Att'y Gen.*, 257 S.W.3d 695, 698 (Tex. 2008) (orig. proceeding) (per curiam); *In re Newton*, 146 S.W.3d 648, 652 (Tex. 2004). Additionally, the divorce decree here is final, and the temporary restraining orders have expired; therefore, any complaints regarding the temporary

restraining orders are moot. *See In re Marriage of Hernandez*, No. 10-09-00136-CV, 2011 WL 3821995, at *4 (Tex. App.—Waco Aug. 10, 2011, no pet.) (mem. op.).

James next argues in this issue that the local rules required that this case be dismissed on January 3, 2021, but that the trial court "disregarded its own timelines." The original petition for divorce in this case was filed on July 13, 2020. The trial court held the final hearing on February 25, 2021, and signed the final decree of divorce on April 15, 2021.

Rule 4.2 of the Local Rules of the District Courts of Leon County, entitled "Time Standards for Family Law Case Disposition," provides:

> Cases shall be tried or dismissed within 6 months from the appearance date or within 6 months from the expiration of the waiting period provided by the Family Code where such is required, whichever is later. Cases not concluded within these time periods will be placed on the Dismissal For Want of Prosecution Docket.

LEON CNTY. (TEX.) DIST. CT. LOC. R. 4.2. But throughout the entire pendency of this case in the trial court, all 254 counties in the State of Texas had been declared a state of disaster by the Governor of Texas "in response to the imminent threat of the COVID-19 pandemic." *See Thirty-Sixth Emergency Ord. Regarding COVID-19 State of Disaster*, 629 S.W.3d 897, 897 (Tex. 2021); *Thirty-Third Emergency Ord. Regarding COVID-19 State of Disaster*, 629 S.W.3d 179, 179 (Tex. 2021); *Twenty-Ninth Emergency Ord. Regarding COVID-19 State of Disaster*, 629 S.W.3d 863, 863 (Tex. 2020); *Twenty-Sixth Emergency Ord. Regarding COVID-19 State of Disaster*, 609 S.W.3d 135, 135 (Tex. 2020); *Twenty-Second Emergency Ord. Regarding COVID-19 State of Disaster*, 609 S.W.3d 129, 129 (Tex. 2020); *Eighteenth Emergency Ord. Regarding COVID-19 State of Disaster*, 609 S.W.3d 122, 122 (Tex. 2020).

Therefore, while this case was pending in the trial court, emergency orders issued by the Texas Supreme Court were in place and provided:

> Subject only to constitutional limitations, all courts in Texas may in any case, civil or criminal—and must to avoid risk to court staff, parties, attorneys, jurors, and the public—without a participant's consent . . . modify or suspend any and all deadlines and procedures, whether prescribed by statute, rule, or order . . . .

*Thirty-Sixth Emergency Ord.*, 629 S.W.3d at 897; *Thirty-Third Emergency Ord.*, 629 S.W.3d at 179–80; *Twenty-Ninth Emergency Ord.*, 629 S.W.3d at 863; *Twenty-Sixth Emergency Ord.*, 609 S.W.3d at 135; *Twenty-Second Emergency Ord.*, 609 S.W.3d at 129; *Eighteenth Emergency Ord.*, 609 S.W.3d at 122–23.  Thus, the trial court did not err in modifying the deadlines in this case.

James's second issue is overruled.

## Issues Three and Five

In his third and fifth issues, James contends that the trial court erred in its determination of his custody and visitation rights to his children.  As part of these issues, James also complains about the trial court's failure to file findings of fact and conclusions of law; however, the record shows that the trial court filed findings of fact and conclusions of law on May 27, 2021.

AUTHORITY

We will reverse a trial court's order on custody, control, possession, and visitation matters only if we determine, from reviewing the record as a whole, that the trial court abused its discretion.  *Patterson v. Brist*, 236 S.W.3d 238, 239–40 (Tex. App.—Houston [1st Dist.] 2006, pet. dism'd); *see Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982).  A trial

court abuses its discretion when it acts arbitrarily or unreasonably, without reference to any guiding rules or principles. *Patterson*, 236 S.W.3d at 240.

In matters of conservatorship, possession, and access, the public policy of this State is to:

>   (1)   assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child;
>
>   (2)   provide a safe, stable, and nonviolent environment for the child; and
>
>   (3)   encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

TEX. FAM. CODE ANN. § 153.001(a). The best interest of the child is the primary consideration when determining issues related to conservatorship and possession of and access to the child. *Id.* § 153.002.

When both parents are appointed as the child's managing conservators, the trial court specifies the rights and duties that are to be exercised by each parent. *Id.* § 153.071. "The court may limit the rights and duties of a parent appointed as a conservator if the court makes a written finding that the limitation is in the best interest of the child." *Id.* § 153.072.

Regarding possession of the child, "[i]t is the policy of this state to encourage frequent contact between a child and each parent for periods of possession that optimize the development of a close and continuing relationship between each parent and child." *Id.* § 153.251(b). The guidelines in the standard possession order are intended to guide courts as to the minimum possession of a child by a parent named as a joint managing

conservator. *Id.* § 153.251(a). And there is a rebuttable presumption that the standard possession order provides the reasonable minimum possession of a child for a parent named as a joint managing conservator and that the order is in the child's best interest. *Id.* § 153.252.

When, however, sufficient evidence rebuts this presumption, the trial court may order possession that deviates from the standard possession order. *In re N.P.M.*, 509 S.W.3d 560, 564 (Tex. App.—El Paso 2016, no pet.); *see* TEX. FAM. CODE ANN. § 153.256. When deviating from the standard possession order, the trial court must be guided by the guidelines established by the standard possession order and may consider: (1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named as a possessory conservator; and (3) any other relevant factor. TEX. FAM. CODE ANN. § 153.256. If the trial court deviates from the standard possession order, the trial court shall, upon timely request, state in writing the specific reasons for the deviation from the standard order. *Id.* § 153.258. A reviewing court's holding that a trial court did not abuse its discretion implies that the evidence contained in the record rebutted the presumption that the standard possession order was reasonable and was in the child's best interest. *N.P.M.*, 509 S.W.3d at 564.

DISCUSSION

Here, James and Amber were appointed joint managing conservators of the children, with Amber having the exclusive right to determine the children's primary residence. James's possession and access were in line with a standard possession order,

but the trial court specified that all James's "possession, visitation, and access shall be under the supervision of [his mother]." In its findings of fact and conclusions of law, the trial court stated its reasons for the deviation from the standard order as follows:

> James Roy Vaughn, IV is entitled to periods of possession with [the children] pursuant to the Standard Possession Order. The Court further found that it would not be in the best interest of the children for James Roy Vaughn, IV's periods of possession to be unsupervised based upon the following factual evidence received: the Court received evidence and testimony during a temporary orders hearing on October 29, 2020, that James Roy Vaughn, IV was discharged from the Air Force on or about October 2019 related to abusing illegal narcotics, namely, heroin and other illegal narcotics, and further that he had been arrested in September 2020 for possession of methamphetamine. That based upon this behavior of James Roy Vaughn, IV that he may be a danger to [the] physical and emotional well-being of the children and that visitation with the children would not be in the children's best interest unless his visits are supervised by his mother . . . . The Court received evidence and testimony during the Final Hearing on February 25, 2021 that James Roy Vaughn, IV had further engaged in assaultive behavior on Christmas 2020 against Amber Vaughn. The court found that based upon drug use in the recent past and his assaulting behavior recently that the visits of James Roy Vaughn, IV with his children should remain supervised by his mother . . . .

James essentially argues that there is no evidence to support the trial court's deviation from the standard order.

First, we must address the evidentiary value of the testimony presented during the October 29, 2020 temporary orders hearing. "In order for testimony from a prior hearing or trial to be considered in a subsequent proceeding, the transcript of that testimony must be properly authenticated and entered into evidence." *Abila v. Miller*, 683 S.W.3d 842, 849 (Tex. App.—Austin 2023, no pet.) (quoting *Guyton v. Monteau*, 332 S.W.3d 687, 693 (Tex. App.—Houston [14th Dist.] 2011, no pet.)). The transcript of the testimony from the October 29, 2020 temporary orders hearing was not authenticated and entered

into evidence at the February 25, 2021 final hearing in this case. Accordingly, the trial court should not have relied on such testimony to support its deviation from the standard possession order, and we cannot consider such testimony in our determination of whether there was sufficient evidence to support the trial court's deviation from the standard order. *See id.* Compare, e.g., *B.L.M. v. J.H.M.*, No. 03-14-00050-CV, 2014 WL 3562559, at *13 (Tex. App.—Austin July 17, 2024, pet. denied) (mem. op.) ("Although the trial court expressly took judicial notice of testimony and evidence admitted at prior hearings—and to the extent the court took judicial notice of factual assertions in documents filed with the court—that is not evidence we can consider as part of an evidence-sufficiency review."), *with A.C. v. M.B.*, No. 01-20-00294-CV, 2021 WL 3729106, at *7 n.7 (Tex. App.—Houston [1st Dist.] Aug. 24, 2021, no pet.) (mem. op.) ("We may consider the testimony from the temporary orders hearing in our sufficiency review because the transcript of the temporary orders hearing was admitted into the evidence at the termination hearing.").

However, when we have a complete transcript of the proceedings before us, we do not view the trial court's written findings as conclusive. *See Lucas v. Tex. Dep't of Protective & Regul. Servs.*, 949 S.W.2d 500, 502 (Tex. App.—Waco 1997, writ denied), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002). Instead, we review the entire record and will not reverse an otherwise correct judgment simply because of an erroneous finding. *In re Marriage of Bonner*, No. 10-10-00011-CV, 2010 WL 4409704, at *3 (Tex. App.—Waco Nov. 3, 2010, no pet.) (mem. op.) (citing *Lucas*, 949 S.W.2d at 502).

We will affirm the trial court's judgment even if its finding lacks sufficient evidentiary support if the record contains sufficient evidence to do so. *Id.*

The record here shows that the following relevant evidence was presented during the February 25, 2021 final hearing in this case. Amber testified that at that time, James's mother was supervising James's visits with the children. Amber further stated that some of James's visits with the children had been "a little bit unstable." Amber explained that during one visit in January, "[James's] mom had to make him leave due to him kicking a LEGO box across the house and breaking it, and screaming and yelling at his parents in front of our children, scaring our children." Amber also explained that in December, on the Saturday after Christmas, James's mother wanted to bring the children to Amber's house and drop them off but that James refused to let his mother do so. James's mother therefore told Amber that she needed to come and pick up the children. Amber stated that when she arrived to pick up the children, James wanted to talk to her, but she could tell that he was "enraged." Amber thus told James that she would speak to him at another time and that she was just going to get the children and leave. Amber testified that James replied, "No, you're not," and then told her that he was "going to beat the F out of [her]." At that time, James slammed her up against the car by her throat and nearly punched her in the face. Amber explained that James did not punch her only because his mother came outside and had him get off her. Amber stated that she waited to call the authorities about the incident until the next day because the children came outside directly after the incident, and she had to "put on a smile" and go home with them.

Additionally, James testified at the final hearing about a text message that he had sent to Amber on December 31 before he went to Montana to see someone that he knew from the military. In the text message, James stated, "[T]here is something messed up in my head." James explained at the final hearing that that "something" was addiction. James went on to testify that he had "not really had a big issue" but that he would sometimes still "get the trigger, the itch, or whatever." James stated that after having his children "kept from [him] and [his] money stolen from [him], the trigger started happening more," so he decided to go to Montana to help fix the issues that he was having.

Considering the foregoing evidence, we cannot say that the trial court abused its discretion by deviating from the standard possession order. *See Gillespie*, 644 S.W.2d at 451 ("The trial court is given wide latitude in determining the best interests of a minor child."); *N.P.M.*, 509 S.W.3d at 564–65 (explaining that trial court is given wide latitude in determining child's best interest because it is in better position to determine what will be in child's best interest since it faced parties and their witnesses, observed their demeanor, and had opportunity to evaluate claims made by each parent). James's third and fifth issues are therefore overruled.

### Issue Four

In his fourth issue, James contends that the trial court's conduct brought into question the impartiality and fairness of the proceeding.

As a prerequisite to presenting a complaint for appellate review, the record must show that, among other things, the complaint was made to the trial court by a timely

request, objection, or motion that stated the grounds for the ruling sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context. TEX. R. APP. P. 33.1(a)(1)(A). Even constitutional complaints must be raised in the trial court for them to be preserved for appellate review. *In re L.M.I.*, 119 S.W.3d 707, 710–11 (Tex. 2003); *In re K.A.S.*, 131 S.W.3d 215, 230–31 (Tex. App.—Fort Worth 2004, pet. denied).

Amber notes that James never filed any motion to recuse the trial judge before entry of the final decree of divorce in this case. *See David v. West*, 433 S.W.3d 101, 107–08 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (holding complaint that trial judge should have been recused was waived by failing to raise it in trial court). Nor have we found anything in the record showing that, before entry of the final decree of divorce, James made any objection about the trial judge's conduct.

But there is an exception to the preservation rules for certain "fundamental" errors, including "those instances in which error directly and adversely affects the interest of the public generally, as that interest is declared by the statutes or Constitution of our State." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006). Accordingly, the Texas Supreme Court has recognized that, in jury trials, claims of judicial bias would not be waived by a failure to object in the trial court if "the conduct or comment cannot be rendered harmless by proper instruction." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam) (citing *State v. Wilemon*, 393 S.W.2d 816, 818 (Tex. 1965)). Additionally, in some circumstances, a complaint regarding judicial conduct during a bench trial may also be raised for the first time on appeal. *See, e.g., In re L.S.*, No. 02-17-

00132-CV, 2017 WL 4172584, at *20 (Tex. App.—Fort Worth Sept. 21, 2017, no pet.) (mem. op.) (holding that trial court's "conduct, as clearly shown on the face of the record, revealed a level of bias and partiality that harmed Father by depriving him of his right to a fair trial before an impartial fact-finder and constituted fundamental error"). Therefore, even though James failed to object about the trial judge's conduct in the trial court, we must address his complaint about such conduct if such conduct constituted fundamental error. *See id.*; *see also In re A.T.M.*, No. 13-21-00008-CV, 2021 WL 2584402, at *18–19 (Tex. App.—Corpus Christi–Edinburg June 24, 2021, no pet.) (mem. op.).

James complains about the following conduct of the trial judge in this case. First, James asserts that during the trial, the trial judge "made four vocalizations in the nature of stating he knew where the information was headed and he need not hear more on the matter." The record shows that Amber testified first at trial and that Amber then called James to testify. During Amber's counsel's examination of James, the following exchange took place:

> [Amber's Counsel]: Your Honor, if I can, again, I'm going to share an exhibit real quick. It's going to be Petitioner's Exhibit 3. I'm skipping 2 intentionally at this point.
>
> THE COURT: Okay. Let's pick it up, [Amber's Counsel], but go ahead.
>
> [Amber's Counsel]: Yes, sir.
>
> THE COURT: I've got the gist of where you're going.
>
> [Amber's Counsel]: Yes, sir.

Thereafter, during James's counsel's examination of James, the following exchange took place:

> [James's Counsel]: And, Judge, I'm going to ask for permission to share my screen, again, if you don't mind.

> THE COURT: Okay. Yes, go ahead. You've still got it. Let's pick it up a little bit, [James's Counsel].

> [James's Counsel]: Yes, sir.

Once James had finished testifying, the following exchange then took place:

> THE COURT: [Amber's Counsel], any other witnesses?

> [Amber's Counsel]: I'm going to call Mrs. Vaughn, again for just a brief rebuttal, Your Honor.

> THE COURT: Okay. I've got a - - Counsel, I've got a gist of the issues in this case, so let's make it very brief, [Amber's Counsel].

> [Amber's Counsel]: I will make it very brief, Your Honor.

James next complains that the trial judge prevented him from calling a witness "with a state certification and ample experience" to testify and that the trial judge only "allotted a predetermined time of 10 minutes for testimony between both sets of counsel." The record shows, however, that once Amber rested, the following exchange took place:

> THE COURT: [James's Counsel], do you rest?

> [James's Counsel]: Judge, I have my client's mother, whose role is supervising visits, ready to testify. I understand the Court wants to speed these proceedings along. So, if the Court wants to hear her testimony, she's ready. If not, then I would also rest.

> THE COURT: Okay. The gist of her testimony is that she's still willing to supervise the visitations. Is that it?

[James's Counsel]:  No, Your Honor.  The gist of her testimony would be to rebut the need for them to be supervised.

THE COURT:  I'm going to allow ten minutes, for purposes of the record. . . .

James's mother testified, and the trial court then inquired whether James had any other witnesses.  James's counsel replied, "No, Your Honor.  At this time, we rest."  Therefore, the record does not show that James was prevented from calling a witness to testify.

Finally, James asserts that he "had already lost all confidence in the judicial integrity of this case" because after the initial court hearing, the trial judge "stated something to the effect of 'I am sorry for the circumstances that led us to this decision', after asking [him] about the time he served in the military."  The record shows that at the temporary orders hearing, testimony was elicited from James that in May 2019, he was serving in the Air Force at the rank of Staff Sergeant.  James admitted, however, that around that time, he had used heroin, was arrested, and was demoted to the rank of Airman Basic.  James nevertheless testified that in December 2019, after serving for approximately six years, he received a general discharge from the Air Force under honorable conditions.

Subsequently, just before the trial court made its ruling on the temporary orders, the following exchange occurred between the trial court and James:

THE COURT:  Thank you, [James's counsel].  Mr. Vaughn, what did you do in the Air Force?

[James]:  I worked with explosives.

THE COURT:  DOD?

[James]: And I worked on munitions, all the way from bullets up to bombs, that went on airplanes.

THE COURT: Very well. I was Security Forces for six years. I got out as a Staff Sergeant.

[James]: Yes, sir.

THE COURT: I'm sorry about your situation with the Air Force. You may have a seat.

. . . The United States Supreme Court . . . has determined that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," and opinions the judge forms during a trial do not necessitate recusal "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, [1157,] 127 L.Ed.2d 474 (1994)). Further, "[n]ot establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger. . . . A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." [*Id.*] at 555–56, 114 S.Ct. [at 1157]. In short, a trial court has the inherent power to control the disposition of cases "with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N*[.] *Am. Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, [166,] 81 L.Ed. 153 (1936).

Similarly, Texas courts have held that "the discretion vested in the trial court over the conduct of a trial is great." *Schroeder v. Brandon*, 141 Tex. 317, [325,] 172 S.W.2d 488, 491 (1943); *see Metzger v. Sebek*, 892 S.W.2d 20, 38 (Tex. App.—Houston [1st Dist.] 1994, writ denied). A trial court has the authority to express itself in exercising this broad discretion. *Bott v. Bott*, 962 S.W.2d 626, 631 (Tex. App.—Houston [14th Dist.] 1997, no writ). Further, a trial court may properly intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time. *Hoggett v. Brown*, 971 S.W.2d 472, 495 (Tex. App.—Houston [14th Dist.] 1997, no pet.); *Great Glob*[.] *Assurance Co. v. Keltex Props., Inc.*, 904 S.W.2d 771, 777 (Tex. App.—Corpus Christi[–Edinburg] 1995, no writ).

*Dow Chem. Co.*, 46 S.W.3d at 240–41 (citations omitted).

Applying these principles to this case and considering James's allegations against the trial judge in the context of the entire record, we conclude that the trial judge's conduct was proper and did not amount to "deep-seated favoritism or antagonism that would make fair judgment impossible." *See Liteky*, 510 U.S. at 555, 114 S.Ct. at 1157. James's fourth issue is therefore overruled.

**Issue Six**

James states his sixth issue as follows: "Are criminal laws and judgment orders being violated currently?" James goes on to complain in the "Argument" section of his appellant's brief about "ongoing interference" by the trial court and "court administration."

We liberally construe both the rules of appellate procedure and the briefs of *pro se* parties. TEX. R. APP. P. 38.9; *Republic Underwriters Ins. Co. v. Mex–Tex, Inc.*, 150 S.W.3d 423, 427 (Tex. 2004). But we may not speculate as to the substance of the specific issues asserted by an appellant. *Strange v. Cont'l Cas. Co.*, 126 S.W.3d 676, 678 (Tex. App.—Dallas 2004, pet. denied). And we may not perform an independent review of the record and the law to determine if the trial court erred. *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.). *Pro se* litigants must follow the same procedural rules as licensed attorneys. *Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 184–85 (Tex. 1978).

An appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). Here, James's brief does not contain any citations to the record to support his sixth issue, nor does his brief contain any citations to specific authority through which

we might review this issue. In fact, we cannot identify from appellant's brief the specific ruling(s) by the trial court of which James complains in this issue. We therefore hold that James has waived this issue by inadequately briefing it. *See Valadez*, 238 S.W.3d at 845.

## Pending Motions

James's "Motion for Ex Parte Temporary Protective Order," included in his appellant's brief, is dismissed as moot.

Amber's "Motion to Require Payment of Costs Pursuant to Rule 145 of the Texas Rules of Civil Procedure and Rule 20 of the Texas Rules of Appellate Procedure," filed on November 19, 2021, is denied to the extent that it seeks different relief from the orders that have already been issued in this appeal.

## Conclusion

In light of the foregoing, we affirm the trial court's final decree of divorce.


MATT JOHNSON
Justice

Before Chief Justice Gray*,
 Justice Johnson, and
 Justice Smith
*(Chief Justice Gray concurs.)
Affirmed
Opinion delivered and filed October 24, 2024
[CV06]

